# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
November 5, 2009 Session

## SAMUEL D. LEGGETT ET AL. v. DUKE ENERGY CORPORATION ET AL.

**Appeal by Permission from the Court of Appeals, Western Section**
**Chancery Court for Fayette County**
**No. 13847     Martha B. Brasfield, Chancellor**

---

**No. W2007-00788-SC-R11-CV - Filed April 23, 2010**

---

The plaintiffs, commercial and residential consumers of natural gas, purchased natural gas from utilities, which had acquired the product wholesale from the defendants. In this class action antitrust suit, the plaintiffs allege that the defendants engaged in various anti-competitive practices, including making false statements about natural gas transactions and engaging in "wash trades" and "churning." After the defendants filed a motion to dismiss, contending that the claims were barred by both field pre-emption and the filed rate doctrine, the chancellor dismissed the claims. The plaintiff appealed and the Court of Appeals reversed, holding that the claims were not subject to dismissal. Because the Natural Gas Act and subsequent federal legislation pre-empt state actions in this particular field of regulation, the judgment of the Court of Appeals is reversed and all claims are dismissed.

**Tenn. R. App. P. 11; Judgment of the Court of Appeals Reversed**

GARY R. WADE, J., delivered the opinion of the Court, in which JANICE M. HOLDER, C.J., CORNELIA A. CLARK, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined.

Brian S. Faughnan and Cannon Fairfax Allen, Memphis, Tennessee, for the appellants, Williams Companies, Inc., Williams Energy Marketing & Trading Company, Inc., and Williams Merchant Services.

Leo Bearman, Jr., Michael Cotter Patton, and W. Michael Richards, Memphis, Tennessee; and Terry J. Houlihan, San Francisco, California, for the appellants, Reliant Energy Services, Inc. and Reliant Energy, Inc.

Jef Feibelman, Memphis, Tennessee, for the appellants, ONEOK, Inc. and ONEOK Energy Marketing and Trading Company, LP.

Douglas Ray Tribble, San Diego, California; John S. Golwen, Memphis, Tennessee; Michael J. Kass, San Francisco, California; and Joshua Ray Denton and Robert Dale Grimes, Nashville, Tennessee, for the appellant, Dynegy Marketing and Trade.

Glen G. Reid, Jr. and Robert Edgar Craddock, Jr., Memphis, Tennessee, for the appellants, CMS Energy Corporation, CMS Field Services, and CMS Marketing Services & Trading Company.

Brent Benoit, J. Michael Dorman, James R. Leahy, and Stacy Williams, Houston, Texas; Paul Howard Morris and Shea Sisk Wellford, Memphis, Tennessee, for the appellants, El Paso Corporation and El Paso Merchant Energy, LP.

Joel B. Kleinman, Washington, DC; Lela M. Hollabaugh and Paul G. Summers, Nashville, Tennessee, for the appellants, Duke Energy Corporation and Duke Energy Trading and Marketing Company, LLC.

Joel B. Kleinman, Washington, DC, for the appellants, American Electric Power Co. and AEP Energy Services, Inc.

Alan G. Crone, Memphis, Tennessee; John S. Wilder, Somerville, Tennessee; and Thomas H. Brill, Mission Hills, Kansas, for the appellees, Samuel D. Leggett, Bing's Stop & Shop, Wolfe River Café, and Frank H. Colvett, Jr.

## OPINION
### Facts and Procedural History[1]

This litigation represents a single component of a complex, nationwide effort by consumers and other purchasers challenging the pricing practices of wholesalers of natural gas. Williams Companies, Inc., Williams Energy Marketing & Trading Company, Inc., Williams Merchant Services, Reliant Energy Services, Inc., Reliant Energy, Inc., ONEOK, Inc., ONEOK Energy Marketing and Trading Company, L.P., Dynegy Marketing & Trade, CMS Energy Corporation, CMS Field Services, CMS Marketing Services & Trading Company, El Paso Corporation, El Paso Merchant Energy, LP, Duke Energy Corporation, Duke Energy Trading and Marketing Company, LLC, American Electric Power Co., and AEP Energy Services, Inc. (the "Defendants") sold natural gas at wholesale to Tennessee utilities (the "Utilities"), which then sold the product at retail to a variety of individuals and businesses in Tennessee, including Samuel D. Leggett, Frank H. Colvett, Jr., Bing's Stop & Shop, Wolfe River Café, and others, who make up the class filing this suit (the "Plaintiffs").

---

[1] Because this case was decided on a motion to dismiss, the following facts were taken from the pleadings.

The Plaintiffs claim that, from at least January 1, 2000, through October 31, 2002, the Defendants engaged in a pervasive and widespread scheme to artificially inflate the price of wholesale natural gas, and that the Utilities passed along those costs to the Plaintiffs.

Reporting firms such as Platts, a division of the McGraw-Hill Companies, gather information about volume and pricing from those in the natural gas market and publish indices reflecting their data, such as Gas Daily and the monthly Inside FERC Gas Market Report ("IFERC"). In turn, natural gas sellers, purchasers, and futures traders rely on the indices to evaluate market conditions and set prices. The Plaintiffs allege that the various Defendants reported thousands of natural gas trades to these firms containing false or misleading information designed to influence the price of gas in their favor. The Plaintiffs contend that, as a part of their efforts to manipulate pricing, the Defendants reported sales that did not exist, failed to report sales that did occur, and reported actual sales accompanied by false information regarding the volume and the price.

The Plaintiffs further assert that certain of the Defendants engaged in "wash trades" and "churning" in an effort to inflate the price of natural gas. "A wash trade is a transaction where two parties simultaneously buy and sell the same quantity of natural gas at the same price and on the same day[,] creat[ing] a false appearance of demand for and short supply of natural gas." E. & J. Gallo Winery v. EnCana Corp., 503 F.3d 1027, 1032 n.3 (9th Cir. 2007). "In churning, volumes of natural gas are sequentially bought and sold by a trader and counterparty so that each time a buy/sell cycle is complete, the basis price has been incrementally increased without the net exchange of any actual natural gas." E. & J. Gallo Winery v. EnCana Energy Servs., Inc., No. CV F 03-5412 AWI LJO, 2008 WL 4224492, at *7 (E.D. Cal. Sept. 12, 2008). The Plaintiffs allege that as a result of these practices, the Defendants caused further artificial inflation of the wholesale prices at which the Utilities purchased natural gas. Because the Utilities, in turn, passed those prices on to retail customers such as the Plaintiffs, the Plaintiffs experienced substantial, unwarranted expense.

All in all, the Plaintiffs contend that more than three-quarters of the trades reported to three of IFERC's "trading desks,"[2] as well as thousands of trades reported to Gas Daily, were false, misleading, or knowingly inaccurate. Since 2002, several of the Defendants have been subjected to civil penalties associated with false reporting and market manipulation. For example, ONEOK, Inc. and ONEOK Energy Marketing and Trading Company, L.P. each paid $3 million in penalties to the Commodity Futures Trading Commission (the "CFTC") in October of 2002; Dynegy Marketing and Trade and non-party West Coast Power LLC paid $5 million to the CFTC in December of 2002; El Paso Corporation and El Paso Merchant

_____

[2] Reporting firms have divided the natural gas market – often by region – into various "trading desks," to reflect variation among different segments of the national market.

Energy, LP paid $20 million in penalties to the CFTC in March of 2003; Williams Companies, Inc., and Williams Energy Marketing & Trading Company, Inc., paid $20 million in civil penalties to the CFTC in July of 2003; Duke Energy Corporation and Duke Energy Trading and Marketing Company, LLC, paid $28 million to the CFTC in September of 2003; CMS Energy Corporation, CMS Marketing Services & Trading Company, and CMS Field Services paid $16 million to the CFTC in November of 2003; during the same month, Reliant Energy Services, Inc.[3] paid $18 million to the CFTC; and American Electric Power Company and AEP Energy Services, Inc., paid $30 million to the CFTC in January of 2005. Further, AEP Energy Services, Inc., paid an additional $30 million to the United States Department of Justice.

In January of 2005, the Plaintiffs filed a complaint for damages under the Tennessee Trade Practices Act ("TTPA") alleging an unlawful conspiracy to increase the wholesale price of natural gas. Later, the case was removed to federal court and referred to a Multi-District Litigation Panel, which assigned the suit to the U.S. District Court for the District of Nevada. The Defendants sought a dismissal for failure to state a claim, but before ruling on the motion, the district court remanded the case to the Chancery Court of Fayette County. On September 18, 2006, the Plaintiffs filed a motion for class certification in the chancery court, seeking certification for two subclasses – first, the "Indirect Residential Class," as represented by Leggett and Colvett, and secondly, the "Indirect Business Class," as represented by Bing's Stop & Shop and Wolfe River Café. See generally Tenn. R. Civ. P. 23 (governing class actions). They defined the proposed subclasses as follows:

Indirect Residential Class

All persons in Tennessee who made indirect purchases of natural gas from any municipality (city, town, or county) or any utility district for a residence, household, apartment, or place of dwelling at any time during the period January 1, 2000 through October 31, 2002. Excluded from the class are indirect business purchasers of any municipality or utility district, direct purchasers, federal government agencies, defendants, defendants' affiliates, or sellers or resellers of natural gas.

Indirect Business Class

All persons, partnerships, associations, private firms, public entities, corporations, and other business entities in Tennessee who made indirect purchases of natural gas from any municipality (city, town, or county) or any utility district for use by their business at any time during the period January

---

[3] Reliant Energy Services, Inc. and Reliant Energy, Inc. have apparently changed their corporate names since this litigation began. For the sake of convenience, we use the old names.

1, 2000 through October 31, 2002. Excluded from the class are indirect residential purchasers of any municipality or utility district, direct purchasers, federal government agencies, defendants, defendants' affiliates, or sellers or resellers of natural gas.

Afterward, the Defendants renewed the motion to dismiss that had initially been filed in the federal district court, arguing first that under the "filed rate doctrine," the cause of action, if allowed to proceed, would invade the exclusive rate-making authority of the Federal Energy Regulatory Commission ("FERC"); and, in the alternative, that any state cause of action would be pre-empted insofar as it applied to "the field of transportation and sales of natural gas in interstate commerce," regardless of whether it specifically violated the filed rate doctrine. In response, the Plaintiffs asserted that the prices at issue were never filed with FERC and thus were not subject to the filed rate doctrine and, further, that pre-emption applies only to wholesale natural gas sales, and the Plaintiffs were retail-level customers.[4] The Defendants, in reply, claimed that the filed rate doctrine continues to apply even when deregulation has ended the practice of formally filing rates, if the rates remain subject to federal policy. In addition, they contended that although the Plaintiffs were retail customers, the conduct at issue occurred in the wholesale market, and thus within the field pre-empted by federal governance. The chancellor conducted a hearing on the motion, and afterwards, both the Plaintiffs and the Defendants filed supplemental pleadings.

On February 2, 2007, at the closing of a subsequent hearing on issues relating to jurisdiction, the chancellor concluded that the claims were barred by federal pre-emption and dismissed the complaint:

> [O]nce the [Natural Gas Act] began the regulation [of pricing of natural gas wholesales in the interstate market], . . . the United States [g]overnment kept it. They had the ability to regulate it. Nobody else had the ability to regulate it. And therefore that regulation is still under the United States [g]overnment, and . . . if it's . . . under the auspices of the [f]ederal [g]overnment, this [s]tate [c]ourt has absolutely no authority to do anything concerning . . . the change in the rates of the wholesale gas. That's up to the [f]ederal [g]overnment. They regulate it; you go to them.

On appeal by the Plaintiffs, the Court of Appeals reversed, relying heavily on E. & J. Gallo Winery, 503 F.3d at 1034, in which the Ninth Circuit Court of Appeals affirmed the denial of summary judgment to various natural gas wholesalers facing similar claims under state

---

[4] The Plaintiffs have since revised their field pre-emption argument to mirror the rationale adopted by the Court of Appeals.

and federal antitrust law. Our Court of Appeals ruled as follows:

> [W]e find that the trial court erred in concluding that all of the Tennessee Purchasers' claims were preempted by federal law. . . . [S]ome of the transactions may be subject to FERC's exclusive jurisdiction, some may not be. From the record before us, it is impossible to make a definitive determination. Because FERC's jurisdiction is predicated upon the nature of each transaction, it was premature to dismiss the case at this early stage of the lawsuit.

Leggett v. Duke Energy Corp., No. W2007-00788-COA-R3-CV, 2008 WL 4756653, at *7 (Tenn. Ct. App. Oct. 29, 2008). Because of the nature and complexity of the issues presented, this Court granted the Defendants' application for permission to appeal.

### Standard of Review and Statutory Interpretation

A Rule 12.02(6) motion to dismiss under the Tennessee Rules of Civil Procedure seeks "to determine whether the pleadings state a claim upon which relief can be granted." Edwards v. Allen, 216 S.W.3d 278, 284 (Tenn. 2007). Such a motion tests only the legal sufficiency of the complaint, not the strength of the proof. The resolution of the motion is determined by an examination of the pleadings alone. Cook ex rel. Uithoven v. Spinnaker's of Rivergate, Inc., 878 S.W.2d 934, 938 (Tenn. 1994) (citing Wolcotts Fin. Servs., Inc. v. McReynolds, 807 S.W.2d 708, 710 (Tenn. Ct. App. 1990)). In considering a motion to dismiss, courts must construe the assertions in the complaint liberally; the motion cannot be sustained unless it appears that there are no facts warranting relief. Id. (citing Fuerst v. Methodist Hosp. S., 566 S.W.2d 847, 848-49 (Tenn. 1978)). On appeal, all allegations of fact by the Plaintiffs must be taken as true. Stein v. Davidson Hotel Co., 945 S.W.2d 714, 716 (Tenn. 1997). Our scope of review is de novo with no presumption of correctness. Colonial Pipeline Co. v. Morgan, 263 S.W.3d 827, 836 (Tenn. 2008); Owens v. Truckstops of Am., 915 S.W.2d 420, 424 (Tenn. 1996).

"Whether a state statute or common law cause of action is preempted by federal law is a question of law [that the appellate courts] review *de novo*." Friberg v. Kansas City S. Ry. Co., 267 F.3d 439, 442 (5th Cir. 2001). "In determining whether a statute expressly or implicitly preempts state law, [courts must] look to the principles of statutory construction." Russell v. United States, 551 F.3d 1174, 1178 (10th Cir. 2008). When interpreting a statute, we "must first ascertain and then give full effect to the [legislature]'s intent and purpose" in drafting those sections. Waldschmidt v. Reassure Am. Life Ins. Co., 271 S.W.3d 173, 176 (Tenn. 2008). Our chief concern is to carry out the legislature's intent without unduly broadening or restricting the statute. Houghton v. Aramark Educ. Res., Inc., 90 S.W.3d 676, 678 (Tenn. 2002) (quoting Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995)). We presume

that every word in a statute has meaning and purpose and should be given full effect if so doing does not violate the legislature's obvious intent. Colonial Pipeline, 263 S.W.3d at 836 (citing In re C.K.G., 173 S.W.3d 714, 722 (Tenn. 2005)). When the statutory language is clear and unambiguous, we simply apply its plain meaning. Eastman Chem. Co. v. Johnson, 151 S.W.3d 503, 507 (Tenn. 2004). When a statute is ambiguous, however, we may refer to the broader statutory scheme, the history of the legislation, or other sources to discern its meaning. Colonial Pipeline, 263 S.W.3d at 836. We presume that a legislative body was aware of its prior enactments and knew the state of the law at the time it passed the legislation. Owens, 908 S.W.2d at 926.

## Analysis
### I. The Tennessee Trade Practices Act

The Tennessee Trade Practices Act ("TTPA"), Tenn. Code Ann. §§ 47-25-101 to -112 (2001), is a general antitrust statute establishing that various anticompetitive practices are "against public policy, unlawful, and void" in the State of Tennessee. Tenn. Code Ann. §§ 47-25-101, -102.[5] Tennessee Code Annotated section 47-25-106 creates a private cause of action for persons harmed by violations of the TTPA:

---

[5]

> All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in the importation or sale of articles imported into this state, or in the manufacture or sale of articles of domestic growth or of domestic raw material, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed, or which tend, to advance, reduce, or control the price or the cost to the producer or the consumer of any such product or article, are declared to be against public policy, unlawful, and void.

Tenn. Code Ann. § 47-25-101.

> Any arrangements, contracts, and agreements that may be made by any corporation or person, or by and between its agents and subagents, to sell and market its products and articles, manufactured in this state, or imported into this state, to any producer or consumer at prices reduced below the cost of production or importation into this state, including the cost of marketing, and a reasonable and just marginal profit, to cover wages or management, and necessary incidentals, as is observed in the usual course of general business, and the continuance of such practice under such contracts and arrangements for an unreasonable length of time, to the injury of full and free competition, or any other arrangements, contracts, or agreements, by and between its agents and subagents, which tend to lessen full and free competition in the sale of all such articles manufactured and imported into the state, and which amount to a subterfuge for the purpose of obtaining the same advantage and purposes are declared to be against public policy, unlawful, and void.

Tenn. Code Ann. § 47-25-102.

Any person who is injured or damaged by any such arrangement, contract, agreement, trust, or combination described in this part may sue for and recover, in any court of competent jurisdiction, from any person operating such trust or combination, the full consideration or sum paid by the person for any goods, wares, merchandise, or articles, the sale of which is controlled by such combination or trust.

In Freeman Industries, LLC v. Eastman Chemical Co., we held that "indirect purchasers" may recover under Tennessee Code Annotated section 47-25-106. 172 S.W.3d 512, 519-20 (Tenn. 2005). In other words, when a wholesaler violates the TTPA and the cost of that violation is passed through a retailer to a consumer, that consumer can seek to recover from the wholesaler, despite the fact that the two parties never directly conducted business with each other. In contrast, federal antitrust law does not permit indirect purchasers to recover for antitrust violations. Ill. Brick Co. v. Illinois, 431 U.S. 720, 729 (1977). In consequence, the Plaintiffs in this case would not likely have a cognizable claim under federal antitrust law, but might be able to sustain a claim under the TTPA.

## II. Pre-emption

Article VI, paragraph 2 of the United States Constitution (the "Supremacy Clause") provides as follows:

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

(Emphasis added.) Pursuant to the Supremacy Clause, federal law sometimes pre-empts otherwise permissible state laws, rendering the state laws without force. E.g., Riegel v. Medtronic, Inc., 552 U.S. 312, 323-25 (2008) (holding that state law claims of negligence, strict liability, and implied warranty against manufacturer were pre-empted by federal law governing approval of medical devices). "When Congress legislates in an area within the federal domain, it may, if it chooses, take for itself all regulatory authority over the subject, share the task with the states, or adopt as federal policy the state scheme of regulations." Narragansett Elec. Co. v. Burke, 381 A.2d 1358, 1361 (R.I. 1977) (citing Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)).

Courts have historically recognized both "express pre-emption" and "implied pre-emption." Express pre-emption occurs when Congress "define[s] explicitly the extent to which its enactments pre-empt state law." English v. Gen. Elec. Co., 496 U.S. 72, 78 (1990);

see, e.g., 29 U.S.C. § 1144(a) (2009) (expressly pre-empting "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described" by 29 U.S.C. § 1003(a) and not exempt under 29 U.S.C. § 1003(b)).  The United States Supreme Court has suggested that "when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." English, 496 U.S. at 79.  In practice, however, an express pre-emption clause is no guarantee that the scope of the pre-emption is clearly defined.  Compare Altria Group, Inc. v. Good, 555 U.S. __, 129 S.Ct. 538, 546 (2008) (holding, via a 5-4 majority, that the express pre-emption clause of the Federal Cigarette Labeling and Advertising Act does not pre-empt state fraud claims based on labels describing cigarettes as "light" cigarettes) with Brown v. Brown & Williamson Tobacco Corp., 479 F.3d 383, 393 (5th Cir. 2007) ("[B]y the express terms of the pre-emption clause . . . fraudulent misrepresentation claims based on the use of [the 'light'] descriptors are pre-empted.").

Even when there is no explicit textual reference to pre-empting state law, pre-emption may be implicit.  See Geier v. Am. Honda Motor Co.., 529 U.S. 861, 884 (2000) (quoting English, 496 U.S. at 78) (noting that "[p]re-emption fundamentally is a question of congressional intent" and discussing implied pre-emption).  Implied pre-emption typically falls into one of three categories: direct conflict pre-emption; "purposes and objectives" conflict pre-emption; and field pre-emption.  Conflict pre-emption is based on the rule that "state law is pre-empted to the extent that it actually conflicts with federal law." English, 496 U.S. at 79.  Direct conflict pre-emption occurs when there is an inescapable contradiction between state and federal law – for example, "where it is impossible for a private party to comply with both state and federal law." Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372-73 (2000).  Even when there is no direct contradiction, however, state law may be pre-empted by federal law when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67 (1941).  Field pre-emption occurs when federal regulation of a field is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." Rice, 331 U.S. at 230.  If the context and substance of the congressional enactments "indicate an intent to occupy a given field to the exclusion of state law," field pre-emption precludes intrusion by the state. Schneidewind v. ANR Pipeline Co., 485 U.S. 293, 300 (1988).

"[D]espite the variety of . . . opportunities for federal preeminence, [courts should] never assume[] lightly that Congress has derogated state regulation . . . ." N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 654 (1995).  "When addressing questions of express or implied pre-emption, we begin our analysis with the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." Altria Group, Inc., 129 S.Ct. at 543 (internal quotation omitted). "[F]ederal regulation of a

-9-

field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons – either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained." Fla. Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142 (1963) (citing Huron Portland Cement Co. v. Detroit, 362 U.S. 440, 447-48 (1960)). That presumption is especially strong when Congress has "legislated . . . in [a] field which the States have traditionally occupied." Rice, 331 U.S. at 230 (citing Davies Warehouse Co. v. Bowles, 321 U.S. 144, 148-49 (1944); Munn v. Illinois, 94 U.S. 113 (1876)).

Finally, because "[p]re-emption . . . is always a federal question," Int'l Longshoremen's Ass'n, AFL-CIO v. Davis, 476 U.S. 380, 388 (1986), our conclusion in a pre-emption case must fall within the boundaries prescribed by United States Supreme Court precedent. See South Carolina v. Bailey, 289 U.S. 412, 420 (1933) ("[I]t was the duty of [the state] court to administer the law prescribed by the Constitution and statute of the United States, as construed by this Court."). We are not empowered to second-guess that Court's wisdom or to disregard its earlier edicts solely because we suspect that the result might be different today.

### III. History of the State/Federal Relationship in Natural Gas

Federal regulation of the natural gas market has had a unique and storied history. On several occasions, the United States Supreme Court has considered the extent of state regulatory authority on the subject. A synopsis of the history may provide context for our consideration of the issues presented in this litigation.

#### A. The "*Attleboro* Doctrine" and the Natural Gas Act of 1938

A 1925 breakthrough in pipeline technology triggered a boom in the interstate natural gas market. Dozier A. DeVane, Highlights of Legislative History of the Federal Power Act of 1935 and the Natural Gas Act of 1938, 14 Geo. Wash. L. Rev. 30, 31 (1945-46). Even before that, however, the Supreme Court had already laid the groundwork for its treatment of an interstate natural gas market. In West v. Kansas Natural Gas Co., the Court considered various challenges to a 1907 Oklahoma statute (1) forbidding out-of-state corporations from engaging in their natural gas market and (2) denying "a charter or right of eminent domain, or right to use the highways of this state" to any corporation transmitting natural gas unless the charter "expressly stipulated" that it would neither transport nor transmit the gas out of the state, nor provide the gas to any "individuals, associations, copartnership companies, or corporations engaged in transporting or furnishing natural gas . . . outside of th[e] State." 221 U.S. 229, 239-40 (1911) (quoting Act of Dec. 21, 1907, ch. 67, § 2, 1907 Okla. Sess. Laws). The Supreme Court ruled that the statute so severely limited any party's ability to move natural gas out of the state, that it "absolutely prevented – prohibited in effect" – interstate commerce in natural gas in violation of Article I, section 8, clause 3 of the U.S.

Constitution (the "Commerce Clause").[6] Id. at 249-50. The Court rejected the argument that the Oklahoma legislation was permissible because there was no federal legislation on the subject:

> [T]his overlooks the affirmative force of the interstate commerce clause of the Constitution. The inaction of Congress is a declaration of freedom from state interference with the transportation of articles of legitimate interstate commerce, and this has been the answer of the courts to contentions like those made in the case at bar.

Id. at 261 (citations omitted). Soon thereafter, the Court confirmed its intention to strike down the Oklahoma statute in its entirety. Haskell v. Kan. Natural Gas Co., 224 U.S. 217, 223-24 (1912).

Although the West decision signaled the Court's willingness to provide a constitutional framework for distinguishing between state and federal interests in the field of natural gas, it did not draw a bright line for those states having legislation less transparently protectionist than the Oklahoma statute. In Public Utilities Commission for Kansas v. Landon, 249 U.S. 236 (1919), however, the Court began to provide clarity on the subject. The Kansas Public Utilities Commission and the Missouri Public Service Commission had set rates for natural gas sales at the consumer level – that is to say, "prices for gas at burner-tips." Id. at 246. When the Kansas Natural Gas Company challenged the Commissions' orders as unconstitutional under West and Haskell, the Court rejected the claim, distinguishing non-retail sales from those at the consumer level:

> That the transportation of gas through pipe lines from one State to another is interstate commerce may not be doubted. . . . But in no proper sense can it be said, under the facts here disclosed, that sale and delivery of gas to their customers at burner-tips by the local companies operating under special franchises constituted any part of interstate commerce. The companies

---

[6] The Commerce Clause provides that Congress shall have the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes." U.S. Const. art. I, § 8, cl. 3. Although the clause is primarily a grant of authority to Congress, courts have long recognized that it also imposes restrictions on the authority of states through what has been called the "dormant Commerce Clause doctrine." See United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth., 550 U.S. 330, 338 (2007) ("Although the Constitution does not in terms limit the power of States to regulate commerce, we have long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute."); Brannon P. Denning, Reconstructing the Dormant Commerce Clause Doctrine, 50 Wm. & Mary L. Rev. 417, 421 (2008) ("In some form, the dormant Commerce Clause doctrine . . . has been a feature of American constitutional law for nearly two centuries.").

received supplies which had moved in such commerce and then disposed thereof at retail in due course of their own local business. . . . Interstate movement ended when the gas passed into local mains.

Id. at 245.

In 1924, the Court, relying on its Landon decision, struck down Kansas and Missouri laws asserting power to regulate rates for upstream sales of natural gas:

[The] sale and delivery . . . to . . . customers at retail is intrastate business and subject to state regulation. In such case the effect on interstate commerce, if there be any, is indirect and incidental. But the sale and delivery here is an inseparable part of a transaction in interstate commerce–not local, but essentially national, in character–and enforcement of a selling price in such a transaction places a direct burden upon such commerce inconsistent with that freedom of interstate trade which it was the purpose of the commerce clause to secure and preserve.

Missouri ex rel. Barrett v. Kan. Natural Gas Co., 265 U.S. 298, 308 (1924). The Court rejected the argument by the states that its holding would leave portions of the natural gas market under-regulated:

The contention that, in the public interest, the business is one requiring regulation, need not be challenged. But Congress thus far has not seen fit to regulate it, and its silence, where it has the sole power to speak, is equivalent to a declaration that that particular commerce shall be free from regulation. . . .

. . . .

The paramount interest is not local but national, admitting of and requiring uniformity of regulation. Such uniformity, even though it be the uniformity of governmental nonaction, may be highly necessary to preserve equality of opportunity and treatment among the various communities and States concerned.

Barrett, 265 U.S. at 308-10 (citing Robbins v. Taxing Dist. of Shelby County, Tenn., 120 U.S. 489, 493 (1887); Hall v. DeCuir, 95 U.S. 485, 490 (1878); Welton v. Missouri, 91 U.S. 275, 282 (1876)). The rule enunciated by Landon and Barrett came to be embodied in "the Attleboro doctrine," as set forth in Public Utilities Commission of Rhode Island v. Attleboro Steam & Electric Co., 273 U.S. 83 (1927). See Phillips Petroleum Co. v. Wisconsin, 347

U.S. 672, 687 (1954) (discussing "the Attleboro doctrine"). In Attleboro, the Court considered the power of the states to regulate the market for electrical current, establishing the bright-line rule that the states could regulate retail sales but not the wholesale market. 273 U.S. at 90; see also Frank R. Lindh, Federal Preemption of State Regulation in the Field of Electricity and Natural Gas: A Supreme Court Chronicle, 10 Energy L.J. 277, 279-85 (1989).

The natural gas boom sparked in 1925,[7] however, rendered the "uniformity of governmental nonaction" imposed by the Attleboro doctrine problematic in the eyes of both Congress and the public. By 1928, Congress had adopted a resolution authorizing the Federal Trade Commission to investigate the electricity and natural gas industries, despite opposition from the industries themselves. S. Res. 83, 70th Cong., 1st Sess. (1928); see DeVane, 14 Geo. Wash. L. Rev. at 32-33. The report to Congress "documented numerous abuses by natural gas companies . . . and recommended federal regulation of interstate natural gas prices." Rodney L. Brown, Jr., Note, Legislative History of the Natural Gas Policy Act: Title I, 59 Tex. L. Rev. 101, 106 (1980); see also Note, Legislative History of the Natural Gas Act, 44 Geo. L. J. 695, 696-97 (1955-56) (discussing Federal Trade Commission reports and their role in the passage of the Natural Gas Act). State commissions, which had been denied the ability to regulate the interstate wholesale natural gas market by the Supreme Court, applied their own pressure, urging Congress to introduce a federal statute for the regulation of natural gas. DeVane, 14 Geo. Wash. L. Rev. at 38. In response, Congress enacted the Natural Gas Act of 1938, ch. 556, 52 Stat. 821 (1938) (codified as amended at 15 U.S.C. § 717 et seq. (2009)) (the "NGA").

The NGA defined its scope as follows:

> The provisions of this Act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for . . . any . . . use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

NGA § 1(b) (emphasis added). The act required that the prices for the regulated gas sales

---

[7] "By 1938 more than 50,000 miles of natural gas pipelines had been constructed and more than 400 billion cubic feet of natural gas moved annually across state lines or our international boundary lines." DeVane, 14 Geo. Wash. L. Rev. at 32. Investment in the pipeline facilities numbered in the billions of dollars. Id.

be filed with and approved by the Federal Power Commission ("FPC") (later FERC).  NGA §§ 2(9), 4.

The original purpose of the NGA, which was restricted to the regulation of interstate sales for resale, was to fill the gap in natural gas regulation created by the Attleboro doctrine:

> An avowed purpose of the Natural Gas Act of June 21, 1938, was to afford, through the exercise of the national power over interstate commerce, an agency for regulating the wholesale distribution to public service companies of natural gas moving interstate, which this Court had declared to be interstate commerce not subject to certain types of state regulation.

Ill. Natural Gas Co. v. Cent. Ill. Pub. Serv. Comm'n, 314 U.S. 498, 506 (1942); see also Fed. Power Comm'n v. Panhandle E. Pipe Line Co., 337 U.S. 498, 502-03 (1949) ("[The NGA] contemplated the exercise of federal power as specified in the Act, particularly in that interstate segment which the states were powerless to regulate because of the Commerce Clause of the Federal Constitution."); Interstate Natural Gas Co. v. Fed. Power Comm'n, 331 U.S. 682, 690 (1947) (discussing congressional intent to occupy a field where the Court had held that states could not act); Fed. Power Comm'n v. Hope Natural Gas Co., 320 U.S. 591, 609-10 (1944) ("[T]he 'basic purpose' of this legislation was 'to occupy' the field in which such cases as [Barrett and Attleboro] had held the States might not act.");  Lindh, 10 Energy L.J. at 285-86 (discussing intent to fill "the Attleboro gap"); Brown, 59 Tex. L. Rev. at 106 ("Congress began efforts to establish a national regulatory scheme because the lack of state power to control the activities of interstate pipelines left an uncontrolled regulatory gap."). As a result, early cases interpreting the scope of the NGA looked to the line set forth in the Attleboro doctrine for guidance.  See, e.g., Panhandle E. Pipe Line Co., 337 U.S. at 502-03; Interstate Natural Gas Co., 331 U.S. at 689-90; Hope Natural Gas Co., 320 U.S. at 609-10; Ill. Natural Gas Co., 314 U.S. at 506-07.

The Attleboro doctrine itself, however, soon fell out of favor as a rule of constitutional law.  In Illinois Natural Gas Co., the Supreme Court observed that its prior rulings endorsing the Attleboro doctrine were in conflict with the rationale expressed in other decisions pertaining to the dormant Commerce Clause doctrine and implied that, if the NGA had not rendered the wholesale/resale distinction in natural gas a question of statutory law, it might reconsider the Attleboro doctrine altogether:

> In the absence of any controlling act of Congress, we should now be faced with the question whether the [test set forth in non-Attleboro cases] is a more reliable touchstone for ascertaining state power than the mechanical distinctions on which appellee relies.  But we are under no necessity of making

-14-

that choice here, for Congress, by the Natural Gas Act, has brought under national control the very matters which the state has undertaken to regulate [in this case].

314 U.S. at 506; see also Fed. Power Comm'n v. E. Ohio Gas Co., 338 U.S. 464, 472 (1950) ("[P]rior constitutional decisions, not what we have since decided or would decide today, form the measure of the gap which Congress intended to close by this Act." (emphasis added)). In 1983, the Supreme Court formally recognized that the Attleboro doctrine had been abrogated as contrary to "roughly the past 45 years" of Commerce Clause jurisprudence. Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n, 461 U.S. 375, 390-91 (1983). The result of this course of events is that, although the influence of Attleboro had rapidly waned in the field of constitutional law, it retained significance in the interpretation of the scope of the NGA, because the doctrine had provided the legal background against which Congress originally legislated the boundaries of federal statutory authority.

## B. Pre-Emption Under the NGA

In the years following its enactment, the Supreme Court began to consider the degree to which the NGA pre-empted state law. See, e.g., Natural Gas Pipeline Co. of Am. v. Panoma Corp., 349 U.S. 44, 44-45 (1955) (holding that Oklahoma law was pre-empted); Phillips, 347 U.S. at 684 (considering whether "states may regulate" certain natural gas sales under the NGA); Ill. Natural Gas Co., 314 U.S. at 509-10 (holding that Illinois law was pre-empted). Although these early cases provided some guidance for courts considering pre-emption claims under the NGA, the Court did not articulate the full extent of that pre-emption until Northern Natural Gas Co. v. State Corporation Commission, 372 U.S. 84 (1963). The Northern Natural Gas Company ("Northern Natural") operated a "pipeline system . . . connected to some 1,100 natural gas wells in the Kansas Hugoton Field [natural gas source] under about 125 purchase contracts." Id. at 86 (footnote omitted). One contract with Republic Natural Gas Company ("Republic") required Northern Natural to purchase "up to the maximum production allowables for Republic's Kansas wells connected to [Northern Natural]'s system." Id. at 86-87. For several years, Northern Natural's demand was so great that it not only met the purchasing obligations to Republic, but it also purchased similar amounts of gas from other Hugoton Field well owners. After 1958, however, Northern Natural's demand fell below the maximum allowables for the field as a whole. In order to comply with its Republic contract, Northern Natural had to purchase far more natural gas from Republic than from the other well owners. Id. at 87-88. In response to the plight of the non-Republic well operators, the Kansas State Corporation Commission entered an order requiring Northern Natural to purchase a ratable (or, in other words, proportional) amount from each of the wells connected to that source. Id. at 86 n.1. Shortly thereafter, that order was superseded by a second order extending the ratable taking requirement to all purchasers. Id. at 89. Unable to comply simultaneously with both its Republic contract and the directives

of the Commission, Northern Natural challenged the orders in Kansas state court.  The Kansas Supreme Court upheld the orders, concluding that there was no conflict with the NGA because "the matters dealt with in [the orders did not] affect interstate transportation or sale [of natural gas] in any respect." N. Natural Gas Co. v. State Corp. Comm'n, 362 P.2d 599, 604 (Kan. 1961).

> The Supreme Court reversed, employing a classic field pre-emption rationale:
>
> The Congress enacted a comprehensive scheme of federal regulation of "all wholesales of natural gas in interstate commerce, whether by a pipeline company or not and whether occurring before, during, or after transmission by an interstate pipeline company."
>
> The federal regulatory scheme leaves no room either for direct state regulation of the prices of interstate wholesales of natural gas, or for state regulations which would indirectly achieve the same result.

Northern Natural, 372 U.S. at 91 (quoting Phillips, 347 U.S. at 682) (citations and footnotes omitted).  This broad pre-emption, the Court observed, was a result of Congress's desire "to achieve . . . uniformity of regulation," id., and did not, the Court stressed, "arise from an asserted actual and immediate conflict between the federal and state regulations," id. at 97.  Instead, the determinative question was "whether the state orders may stand in the face of the pervasive scope of federal occupation of the field." Id. at 98 (citing San Diego Bldg. Trades Council v. Garmon, 359 U.S. 236, 241-44 (1959)).  The Court concluded they could not.

C.  Deregulation and the *Transcon* Era

In the 1970s, the United States experienced a natural gas shortage that has been widely attributed to the supply-suppressing effects of the NGA's stringent price controls. Pub. Serv. Comm'n v. Mid-La. Gas Co., 463 U.S. 319, 330-31 (1983); see also Stephen Breyer & Paul W. MacAvoy, The Natural Gas Shortage and the Regulation of Natural Gas Producers, 86 Harv. L. Rev. 941, 965-79 (1973); Brown, 59 Tex. L. Rev. at 110-16; Richard J. Pierce, Jr., Natural Gas Regulation, Deregulation, and Contracts, 68 Va. L. Rev. 63, 69-72 (1982).  In response to the shortage, Congress enacted the Natural Gas Policy Act of 1978, Pub. L. No. 95-621, 92 Stat. 3350 (1978) (codified as amended at 15 U.S.C. §§ 3301-3432 (2009)) (the "NGPA"), which introduced elements of deregulation into the framework established by the NGA.  The core reform of the NGPA was to "replace[] the federal price controls that had been established under the [NGA] with price ceilings that rise monthly based on 'an inflation adjustment factor' and other considerations." Energy Reserves Group, Inc. v. Kan. Power & Light Co., 459 U.S. 400, 405 (1983).  The NGPA determined which ceiling would apply to a given transaction by subdividing natural gas into various classifications that would be

treated differently under the act. Mid-La. Gas Co., 463 U.S. at 332-33; Energy Reserves Group, 459 U.S. at 406. Generally, these classifications could be broken down into three major types of gas: high-cost, new, and old. NGPA §§ 102-109; see Steven M. Spaeth, Our Experience Under the Natural Gas Policy Act of 1978, and Its Relevance to the Natural Gas Wellhead Decontrol Act of 1989, 12 U. Ark. Little Rock L. Rev. 265, 27-721 (1989) (discussing the distinctions between high-cost, new, and old gas); Kevin L. Ward, Note, Preemption Survives Deregulation of Natural Gas: *Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Board of Mississippi*, 22 Tulsa L.J. 639, 646-47 (1987) (same). Although the specific definitions of new, old, and high-cost gas are complex, what is relevant to our inquiry is that "first sales," see infra, of most high-cost gas and new gas were gradually deregulated under the NGPA. Specifically, the act removed the price of first sales of high-cost gas from the jurisdiction of FERC shortly after it was enacted, while deregulating first sales of most new gas over a span of years. NGPA § 121; see also Spaeth, 12 U. Ark. Little Rock L. Rev. at 271-72. The NGPA also modified the boundaries of the state/federal balance in natural gas regulation. Section 105(a) of the NGPA extended the federal price ceilings to some aspects of the intrastate natural gas market; section 602(a), however, explicitly preserved state authority to impose maximum prices on intrastate sales that were below the federal maximums. In other words, the NGPA expressly provided for overlapping state and federal jurisdiction in the intrastate market. See Exxon Corp. v. Eagerton, 462 U.S. 176, 186 (1983).

The Supreme Court quickly confirmed that field pre-emption survived the enactment of the NGPA, at least in some form. In Exxon Corp. v. Eagerton, for example, several natural gas producers challenged an Alabama law prohibiting them from passing the state severance tax along to consumers. While conceding that there was no direct conflict between the pass-through prohibition and the NGPA, id. at 183, the Court nevertheless found that the Alabama law was "pre-empted by federal law insofar as it applied to sales of gas in interstate commerce" because "the pass-through prohibition represented an attempt to legislate in a field that Congress has chosen to occupy." Id. at 184. The Court explained:

> The Alabama pass-through prohibition trespassed upon FERC's authority over wholesale sales of gas in interstate commerce, for it barred gas producers from increasing their prices to pass on a particular expense–the increase in the severance tax–to their purchasers. Whether or not producers should be permitted to recover this expense from their purchasers is a matter within the sphere of FERC's regulatory authority.

Id. at 185.

In Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Board, ("Transcon") the

Court went a step further, holding that field pre-emption under the NGPA extended even to high-cost gas sales that had been deregulated. 474 U.S. 409, 424-25 (1986). Transcon, like Northern Natural, involved a ratable taking requirement. A Mississippi law "requir[ed] an interstate pipeline to purchase gas from all the parties owning interests in a common gas pool . . . in proportion to the owners' respective interests in the pool." Id. at 411. Interstate pipeline operator Transcon contracted to purchase gas from Marion County, Mississippi's Harper Sand gas pool, which yielded gas classified as high-cost under the NGPA. When the Mississippi Oil and Gas Board found that Transcon's Harper Sand purchases violated the ratable taking law, Transcon, arguing pre-emption, challenged the ruling in the state court. The Board conceded that the ratable taking law, prior to the enactment of the NGPA, would have been pre-empted, but argued that Congress, in deregulating high-cost gas, had subjected that product to state regulation. Transcont'l Gas Pipeline Corp. v. State Oil & Gas Bd., 457 So. 2d 1298, 1314 (Miss. 1984). The Mississippi Supreme Court agreed with the Board, holding that "[w]ith respect to [high-cost] gas, the regulatory situation existing at the time Northern Natural was decided ha[d] . . . been altered radically." Id. at 1316. In upholding the ratable taking requirement of the Harper Sand wells, the court concluded that "[i]f the NGA and FERC's jurisdiction under the NGA no longer extend to deregulated gas, and FERC has no authority to regulate the first sales and purchases of deregulated gas either directly or indirectly, then [the holding in] Northern Natural does not dictate a preemption of otherwise existing state authority." Id. at 1316-17.

In a 5-4 decision, the Supreme Court reversed, observing, as an initial matter, that based on content and legislative history, the NGPA did not signal a retreat from a comprehensive federal gas policy and, "in some respects expanded federal control, since it granted FERC jurisdiction over the intrastate market for the first time." Transcon, 474 U.S. at 421 (citing NGPA §§ 311-12). After examining the congressional intent behind the decision to deregulate first sale prices of high-cost gas, the Court concluded that "[t]o the extent that Congress denied FERC the power to regulate affirmatively particular aspects of the first sale of gas, it did so because it wanted to leave determination of supply and first-sale price to the market." Id. at 422. The Court then reasoned that "[a] federal decision to forgo regulation in a given area may imply an authoritative federal determination that the area is best left unregulated, and in that event would have as much pre-emptive force as a decision to regulate." Id. (quoting Ark. Elec. Coop. Corp., 461 U.S. at 384). Based on that principle, the Court ruled that the Board's ratable taking rule was pre-empted:

> The proper question in this case is not whether FERC has affirmative
> regulatory power over wellhead sales of [deregulated] gas, but whether
> Congress, in revising a comprehensive federal regulatory scheme to give
> market forces a more significant role in determining the supply, the demand,
> and the price of natural gas, intended to give the States the power it had denied

FERC. The answer to the latter question must be in the negative. First, when Congress meant to vest additional regulatory authority in the States it did so explicitly. Second, although FERC may now possess less regulatory jurisdiction over the "intricate relationship between the purchasers' cost structures and eventual costs to wholesale customers who sell to consumers in other States," than it did under the old regime, that relationship is still a subject of deep federal concern. FERC still must review Transco's pricing practices, even though its review of Transco's purchasing behavior has been circumscribed. In light of Congress' intent to move toward a less regulated national natural gas market, its decision to remove jurisdiction from FERC cannot be interpreted as an invitation to the States to impose additional regulations.

Id. at 422-23 (quoting Northern Natural, 372 U.S. at 92) (emphasis added) (citations omitted). The Court further concluded that the ratable taking rule "runs afoul of other concerns identified in Northern Natural. First, it disturbs the uniformity of the federal scheme . . . . Second, Mississippi's order would have the effect of increasing the ultimate price to consumers." Id. at 423. The Court, therefore, held that the ratable taking requirement was pre-empted under the NGA as amended by the NGPA, just as it would have been pre-empted under the NGA before the amendments. Id. at 425.

Two years later, the Court had the opportunity to clarify the full scope of pre-emption under Northern Natural and Transcon. A Michigan statute ("Act 144") required certain natural gas companies to obtain approval from the Michigan Public Service Commission ("MPSC") before issuing long-term securities. As part of the approval process, the MPSC was empowered to "conduct an investigation, including an appraisal of the company's property at the company's expense." Schneidewind, 485 U.S. at 298. The MPSC would not approve an issuance of long-term securities until "satisfied that the funds derived . . . are to be applied to lawful purposes and that the issue and amount is essential to the successful carrying out of the purposes or that the issue of the stock fairly represents accumulated and undistributed earnings invested in capital assets and not previously capitalized." Id. (quoting Mich. Comp. L. Ann. § 460.301(3) (1967 & Supp. 1987)). In Schneidewind v. ANR Pipeline Co., the Supreme Court considered pipeline operators' challenges to Act 144, concluding that it was pre-empted by the NGA and NGPA. Id. at 310. First, however, the Court rejected the pipeline operators' argument that the state law was necessarily pre-empted because it would have violated the dormant Commerce Clause doctrine at the time of the enactment of the NGA:

Even if Commerce Clause jurisprudence would have barred Act 144's regulation at the time of the enactment of the NGA, an issue never directly

settled by the Court, that would not decide this case.  The authorities on which respondents rely state only [that] Congress occupied the field of matters relating to wholesale sales and transportation of natural gas in interstate commerce.  The question remains, however, whether Act 144 regulates <u>within</u> this exclusively federal domain. . . . An intent to pre-empt state regulation thus cannot be inferred from the mere fact that States were precluded from such regulation at the time of the NGA's enactment.

<u>Id.</u> at 305-06 (citation omitted).  The Court did not disavow its earlier reliance on the <u>Attleboro</u> doctrine as an interpretive guide in construing the scope of federal authority intended by Congress at the time of the enactment of the NGA; instead, its reasoning made clear that, regardless of the role <u>Attleboro</u>-era jurisprudence played in Congress's initial drafting, when a court considers whether a state law is pre-empted by the NGA and NGPA, it cannot simply place itself in the shoes of a 1938 court and decide the statutory case as if it were a constitutional one.  It is the specific content of the federal natural gas statutes that determines the scope of the field of pre-emption.

The Court concluded that the "crux of the issue" was "whether Act 144 is a regulation of the rates and facilities of natural gas companies used in transportation and sale for resale of natural gas in interstate commerce.  Since . . . it [was], . . . it [was] pre-empted."  <u>Id.</u> at 306.  The Court also noted that the Michigan Supreme Court had previously held that Act 144 was intended to protect both investors, who would purchase the securities, and consumers, who demanded "efficient and uninterrupted service at reasonable rates."  <u>Id.</u> at 307 (citing <u>Attorney Gen. v. MPSC</u>, 316 N.W.2d 187, 193 (Mich. 1982), and quoting <u>Ind. & Mich. Power Co. v. Pub. Serv. Comm'n</u>, 275 N.W.2d 450, 453 (Mich. 1979)).  In light of the consumer protection purpose, the Court concluded that "when applied to natural gas companies, Act 144 amounts to a regulation of rates and facilities, a field occupied by federal regulation."  <u>Id.</u>  Moreover, the Court held that the aim of "ensur[ing] that a company is financed in a way that will allow proper maintenance of its facilities and continuance of its services . . . also falls within FERC's exclusive purview since those facilities are a critical part of the transportation of natural gas and sale for resale in interstate commerce."  <u>Id.</u> at 308.  When considered in these terms, <u>Schneidewind</u> appears to stake out a broader interpretation of the pre-emptive force of the NGA and NGPA than had been apparent in earlier cases.  <u>See</u> Peter Wirth, Note, <i>Schneidewind v. ANR Pipeline Co.</i>, 30 Nat. Resources J. 227, 233 (1990) ("By invalidating the Michigan securities statute, the Court extended its reasoning in <u>Transco</u> and <u>Northern Natural</u> to a statute that does not address any of the . . . areas Congress sought to regulate in passing the Natural Gas Act.").  Indeed, compared to a ratable taking requirement, which would directly regulate the transactions targeted by the NGA, <u>see</u> <u>Northern Natural</u>, 372 U.S. at 92, the Michigan statute's relevance to wholesale rate-making seems attenuated and incidental; nevertheless, the broad scope of pre-emption

laid out in <u>Schneidewind</u> remains good law. <u>But see</u> <u>Nw. Cent. Pipeline Corp. v. State Corp. Comm'n</u>, 489 U.S. 493, 496, 512-13 (1989) (holding that a regulation "govern[ing] the timing of production of natural gas from" a certain field was not pre-empted because the NGA explicitly does not regulate "production and gathering" of gas).

D. The Wellhead Decontrol Act

The NGPA did not end federal deregulation of natural gas. Many observers felt that the more modest price controls under the NGPA, like the stronger controls that preceded them, were having a damaging effect on the natural gas market. Judith M. Matlock, <u>The Natural Gas Wellhead Decontrol Act of 1989</u>, 19 Colo. Law. 655, 655-56 (1990) (discussing criticisms of the post-NGPA price controls). In response to calls for further deregulation, Congress enacted the Natural Gas Wellhead Decontrol Act of 1989, Pub. L. No. 101-60, 103 Stat. 157 (the "WDA"). The WDA "completely eliminated FERC's authority to set prices at the wellhead by removing 'first sales' from FERC's rate-setting jurisdiction." <u>E. & J. Gallo Winery</u>, 503 F.3d at 1037. The Plaintiffs and Defendants in this case disagree on how to interpret the statutory definition of "first sales." According to the Ninth Circuit Court of Appeals, "first sales are, in essence, merely sales of natural gas that are <u>not</u> preceded by a sale to an interstate pipeline, intrastate pipeline, local distribution company, or retail customer." <u>Id.</u> (citing 15 U.S.C. § 3301(21)(B)) (emphasis added). "Additionally, to give effect to the North American Free Trade Agreement . . . all sales of Canadian and Mexican natural gas are also first sales." <u>Id.</u> (citing Energy Policy Act of 1992, Pub. L. No. 102-486, 106 Stat. 2866 (codified at 15 U.S.C. § 717b(b)). The precise definition of what is and is not a first sale has been and will continue to be a source of disagreement in the natural gas industry. Suffice it to say that at this juncture, however, Congress has by deregulating first sale pricing substantially increased the number of natural gas transactions that are wholly free of federal price controls.

Finally, FERC itself took additional steps to further deregulate the natural gas transactions within its remaining jurisdiction in hopes of developing a more competitive market. In December of 1992, FERC effectively suspended the rate-filing requirements for all sales for resale within its jurisdiction by offering "blanket marketer certificates" for sales for resale other than sales to interstate pipelines (which themselves were already subject to blanket approval). Regulations Governing Blanket Marketer Sales Certificates, 57 Fed. Reg. 57,952, 57,957-58 (Dec. 8, 1992) (codified at 18 C.F.R. pt. 284); <u>see</u> <u>E. & J. Gallo Winery</u>, 503 F.3d at 1038. After revelations of price manipulation, FERC amended the blanket certificates to include a prohibition on anti-competitive acts. Amendments to Blanket Sales Certificates, 68 Fed. Reg. 66,323 (Nov. 26, 2003) (codified at 18 C.F.R. pr. 284); <u>see</u> <u>E. & J. Gallo Winery</u>, 503 F.3d at 1038.

Historical Summary

-21-

In the early days of the natural gas industry, the Supreme Court recognized and enforced a rigid distinction between federal and state authority over the natural gas market, based primarily around the wholesale/retail distinction embodied in the Attleboro doctrine. In response, Congress enacted the NGA, which was designed to fill the "Attleboro gap" (the regulation of the interstate wholesale market) without interfering in states' constitutionally permitted authority to regulate the retail and intrastate natural gas market. Because, however, the Attleboro doctrine itself fell quickly out of favor, the wholesale/retail distinction in the NGA became an issue of statutory rather than constitutional law. In Northern Natural, the Supreme Court held that the NGA established field pre-emption for interstate wholesales of natural gas. The NGPA deregulated first sales of much of the gas that had been subject to price controls under the NGA, but the Court held in Transcon that deregulation did not disturb the field pre-emption recognized in Northern Natural. Finally, the WDA deregulated the remaining regulated first sales, and subsequent FERC action eliminated rate-filing requirements for sales within its jurisdiction through blanket pre-approvals. Nevertheless, the Supreme Court has not suggested that either the WDA or the FERC deregulation has affected the import of the holding in Transcon.

## IV. Analysis

The Plaintiffs do not contest that broad field pre-emption has been a cardinal feature of natural gas regulation for much of the previous century. Instead, they argue that under the current federal regime – and especially in light of the deregulatory steps taken in the WDA – their claims are not pre-empted because they arise, at least in part, out of transactions that are not within FERC jurisdiction. For the reasons set out below, we disagree.

As the United States Supreme Court has observed,

[m]aintaining the proper balance between federal and state authority in the regulation of . . . energy utilities has long been a serious challenge to both judicial and congressional wisdom. On the one hand, the regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States. On the other hand, the production and transmission of energy is an activity particularly likely to affect more than one State, and its effect on interstate commerce is often significant enough that uncontrolled regulation by the States can patently interfere with broader national interests.

Ark. Elec. Co-op. Corp., 461 U.S. at 377 (citation omitted).

When considering a claim that a Tennessee statute is subject to field pre-emption, we must first determine whether Congress intended to enact a system of field pre-emption, or if, in the alternative, Congress intended to limit state authority more narrowly – by pre-

empting, for example, only those state regulations in actual conflict with the relevant federal law. If we conclude that field pre-emption exists, whatever the area of law, the second step in our analysis is to determine whether the Tennessee law intrudes upon that field. The Tennessee law survives only if it does not fall within the pre-empted field. Schneidewind, 485 U.S. at 305 ("The question remains . . . whether Act 144 regulates within th[e] exclusively federal domain.").

### A. Field Pre-emption and its Scope under the WDA

There are no "precise guidelines" for determining whether or how broadly field pre-emption has occurred, because "each case turns on the peculiarities and special features of the federal regulatory scheme in question." City of Burbank v. Lockheed Air Terminal Inc., 411 U.S. 624, 638 (1973) (citing Hines, 312 U.S. at 52; Huron Portland Cement Co., 362 U.S. at 440)). The ultimate question, however, is one of congressional intent: did Congress intend to "le[ave] no room for the States to supplement" the federal system of regulation in a particular field? Rice, 331 U.S. at 230.

The Plaintiffs assert that, due to the enactment of the WDA, many of the wholesale natural gas transactions that were subject to FERC jurisdiction at the time of Transcon and Northern Natural no longer are. This, they argue, demonstrates that Congress did not intend to exclude those transactions from state regulation. As the Supreme Court has noted, however, "a federal determination that deregulation was appropriate [is] entitled to as much weight in determining pre-emption as a federal decision to regulate actively." Transcon, 474 U.S. at 415 (citing Ark. Elec. Coop. Corp., 461 U.S. at 384).

Nevertheless, the Plaintiffs are right to suggest that deregulation complicates our inquiry. Field pre-emption cases that involve statutes with a history of deregulation present unique challenges that more traditional field pre-emption cases do not. For example, courts typically look to whether Congress has enacted an "intricate web of statutory provisions [that] affords no room for the imposition of state-law" requirements. French v. Pan Am Exp., Inc., 869 F.2d 1, 4 (1st Cir. 1989). A chief purpose of deregulation, however, is to ensure that an industry is not overburdened by an "intricate web" of restrictive requirements. In a field pre-emption case involving deregulation, therefore, the scope and complexity of the relevant federal statutes are less helpful indicators of congressional intent than they would ordinarily be. Instead, we must ascertain congressional intent from other indicators as to whether the deregulatory legislation – in this case, the WDA, when read in the context of the NGA and NGPA – altogether precludes states from regulation. Because it is well-established under Transcon that Congress had enacted broad field pre-emption prior to the WDA, our inquiry is whether Congress repealed or reduced the scope of the pre-emptive regime, not whether it intended to implement an entirely new system of pre-emption. Cf. United States v. Locke, 529 U.S. 89, 108 (2000) ("[A]n 'assumption' of nonpre-emption is

not triggered when the State regulates in an area where there has been a history of significant federal presence.").

That question is almost identical to the question that faced the Supreme Court in Transcon. In that case, the Court considered whether the pre-emption ruling in Northern Natural could be applied to gas that had been removed from FERC jurisdiction by the NGPA. In the case before us, we consider whether pre-emption continues to apply to gas that was removed from FERC jurisdiction by the WDA. If there is anything about the WDA that would dictate a different conclusion than that reached in Transcon regarding the NGPA, the Plaintiffs would prevail.

In our view, the Plaintiffs have not provided any persuasive reason to treat the pre-emptive effect of the two acts differently. Instead, they argue that this case is distinguishable from Transcon due to differences between the TTPA and the Transcon ratable taking requirement. We take that argument as relevant to the second step in our field pre-emption analysis – whether the Plaintiffs' TTPA claims intrude on the field of pre-emption – but irrelevant to the question of whether the WDA, unlike the NGPA, reduced the pre-emptive force of the NGA.

When rejecting the argument that the NGPA reduced the pre-emptive effect of the NGA, the Court in Transcon made the following observation:

> The aim of federal regulation remains to assure adequate supplies of natural gas at fair prices, but the NGPA reflects a congressional belief that a new system of natural gas pricing was needed to balance supply and demand. The new federal role is to "overse[e] a national market price regulatory scheme." The NGPA therefore does not constitute a federal retreat from a comprehensive gas policy.

474 U.S. at 421 (quoting Barry L. Haase, The Federal Role in Implementing the Natural Gas Policy Act of 1978, 16 Hou. L. Rev. 1067, 1079 (1979)) (citations omitted) (emphasis added). In other words, the purpose of the NGPA was not to withdraw from the regulation of the wholesale natural gas market, but instead to replace the older, more direct method of exercising that responsibility with a newer, more hands-off approach. Because the NGPA was merely a change in approach, the scope of pre-emption did not contract. The same logic applies in this instance. Congress appears to have been driven by the same desire to deregulate in the enactment of the NGPA and the WDA. Like the NGPA, however, the WDA did not put an end to federal oversight. As evidenced by FERC's own efforts to refine its pricing policy in the decades since the WDA, the federal government is still an active regulator of the wholesale market in natural gas. A tool has merely been eliminated by the

Congress – the ability to regulate directly the price of first sales – just as Congress eliminated the direct regulation of the first sale price of new and high-cost gas in the NGPA.

Furthermore, if indeed Congress intended by the WDA to reduce the amount of regulation of the natural gas market, it would make little sense to conclude that Congress simultaneously intended to expand states' authority to regulate that same market. The last three decades of federal natural gas policy – from the NGPA to the more recent FERC orders – demonstrate a desire to lessen regulations in the natural gas market; nothing, however, suggests a congressional aim to benefit the market by yielding to more intrusive legislation by the states. Moreover, "[r]epeals by implication are not favored." Sullivan ex rel. Wrongful Death Beneficiaries of Sullivan v. Chattanooga Med. Investors, LP, 221 S.W.3d 506, 512 (Tenn. 2007) (quoting Cronin v. Howe, 906 S.W.2d 910, 912 (Tenn. 1995)). Although the WDA did repeal some of the affirmative powers laid out in the NGA, nothing in the enactment implies that Congress intended to repeal the well-established policy of pre-emption laid out in Transcon.

In our view, therefore, the field of pre-emption today is identical to the field recognized by the Supreme Court in pre-WDA cases: "the field of wholesale sales of natural gas in interstate commerce." Exxon Corp., 462 U.S. at 184; see also Schneidewind, 485 U.S. at 301 ("the transportation and sale of natural gas in interstate commerce for resale"); Northern Natural, 372 U.S. at 91 ("all wholesales of natural gas in interstate commerce" (quoting Phillips, 347 U.S. at 682)). Because there is field pre-emption, we turn to whether our state legislation intrudes upon the field.

### B. Application to the TTPA Claims

Our next step is to consider whether enforcing the Plaintiffs' claims under the TTPA would improperly intrude upon the federal field of pre-emption.[8] Two electrical power cases from the Ninth Circuit Court of Appeals, Public Utility District No. 1 of Grays Harbor County Washington v. IDACORP Inc., 379 F.3d 641 (9th Cir. 2004) and Public Utility District No. 1 of Snohomish County v. Dynegy Power Marketing Inc., 384 F.3d 756 (9th Cir. 2004), provide helpful guidance. In Grays Harbor, that court considered a complaint by a local utility district seeking damages for unjust enrichment and the rescission of its contract with an electricity wholesaler. The utility alleged, among other things, that the defendants

---

[8] As an initial matter, the Plaintiffs go to great lengths to distinguish their TTPA claims from the ratable taking requirements at issue in Northern Natural and Transcon. As we have discussed, however, Northern Natural and Transcon do not define the outer bounds of natural gas field pre-emption. The securities regulation struck down in Schneidewind was significantly more attenuated from the core concerns of the NGA than the ratable taking requirements, and the Supreme Court still found pre-emption. Whether the TTPA claims can be distinguished from a ratable taking requirement is, therefore, not determinative.

had engaged in market manipulation that inflated the price at which they sold electricity. 379 F.3d at 645. The court held that the claims were barred on three grounds: (1) field pre-emption, (2) conflict pre-emption, and (3) the filed rate doctrine. Id. at 647. As to field pre-emption, the court held that because the "fundamental thrust" of the claim alleging market manipulation was "to determine the fair price of the electricity," id. at 648, that claim was barred by field pre-emption under the Federal Power Act ("FPA"), which "grants FERC 'exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce,'" id. at 646 (quoting Transmission Agency of N. Cal. v. Sierra Pac. Power Co., 295 F.3d 918, 928 (9th Cir. 2002)); see also id. at 649-52 (discussing conflict pre-emption and the filed rate doctrine). In Snohomish County, the Ninth Circuit extended the rationale in Grays Harbor to pre-empt state antitrust claims. 384 F.3d at 761.

Grays Harbor and Snohomish County are, admittedly, distinguishable. First, of course, they consider electrical power, rather than natural gas, and thus are based on the FPA, not the NGA. The underlying principle, however – that price manipulation claims are pre-empted insofar as the field of price regulation is itself pre-empted – is equally applicable to natural gas under the NGA. Cf. DeVane, 14 Geo. Wash. L. Rev. passim (discussing shared history of the NGA and the FPA). Second, the market-based rates at issue in those cases were the result of deregulation by FERC, whereas some of the market-based rates in this case were the result of deregulation by statute. Compare Grays Harbor, 379 F.3d at 649 ("Idaho Power Company's authority to charge market-based rates comes from FERC.") with discussion of high-cost gas and first sales under the NGPA and WDA, supra. We express no opinion on whether that difference would be relevant to the conflict pre-emption and filed rate doctrine rationales in Grays Harbor. As we have already determined, however, the NGPA and WDA did not alter the broad scope of statutory field pre-emption under the pre-deregulation NGA. For that reason, whether deregulation was statutory or administrative is immaterial. We, therefore, believe that Grays Harbor and Snohomish County provide useful guidance by way of analogy.

Nevertheless, the Plaintiffs argue that the TTPA claims are not pre-empted because the TTPA is "complementary" to the NGA and its amending acts. The TTPA, they submit, is intended only to assure that goods are priced competitively, a goal consistent with the NGA, NGPA, and WDA. For that reason, they argue, there is no pre-emption. We disagree. Even if we were to assume that the TTPA claims would not be pre-empted if they were purely "complementary" to the federal regulatory regime,[9] our inquiry would not end there,

_____

[9] To the contrary, however, it is highly questionable that complementarity can ever be a defense against field pre-emption. See Locke, 529 U.S. at 115 ("When Congress has taken the particular subject matter in hand coincidence is as ineffective as opposition, and a state law is not to be declared a help because

(continued...)

-26-

because an abstract preference for "competitive" pricing was not the only goal of the federal enactments. Rather, the Plaintiffs' argument would fail because it ignores two of the additional purposes of the federal statutory scheme: national uniformity and freedom from burdensome government intervention.

For decades, the Supreme Court has consistently identified uniformity as a central purpose of the NGA. See Schneidewind, 485 U.S. at 310 (referring to "the uniformity of regulation which was an objective of the Natural Gas Act" (quoting Northern Natural, 372 U.S. at 91-92)); Transcon, 474 U.S. at 423 ("Mississippi's order . . . disturbs the uniformity of the federal scheme, since interstate pipelines will be forced to comply with varied state regulations of their purchasing practices."). If we were to hold that this state could impose restrictions on the interstate wholesale natural gas market by way of its antitrust laws, we would imply that every other state could do so as well. There is much disagreement as to the meaning of a "competitive" market, and, therefore, when antitrust law should intervene. See Robert H. Bork, The Antitrust Paradox: A Policy at War with Itself 58-61 (1978) (discussing different models of "competitive" markets). If we were to conclude that there is no pre-emption, interstate natural gas wholesalers could be forced to comply with the rules of fifty different states regarding what reporting practices or transactions might qualify as anti-competitive. To avoid such an outcome, Congress is free to legislate when one "need serve but one master." Rice, 331 U.S. at 234. In our assessment, Congress has chosen to adopt

---

[9](...continued)
it attempts to go farther than Congress has seen fit to go." (quoting Charleston & W. Carolina Ry. Co. v. Varnville Furniture Co., 237 U.S. 597, 604 (1915)); Rice, 331 U.S. at 236 ("[I]f a licensed warehouseman complied with each requirement [of the federal statute that pre-empted the relevant field], he did all that he need do. He could not be required by a State to do more or additional things or conform to added regulations, even though they in no way conflicted with what was demanded of him under the Federal Act."). It is true that, in Transcon and Northern Natural, the Supreme Court considered the degree to which ratable taking requirements would conflict with the goals of the federal price regulations found in the NGA and NGPA. See Transcon, 474 U.S. at 420 ("[I]n the absence of ratable-take requirements, purchasers would choose a different, and presumably less costly, purchasing pattern."); Northern Natural, 372 U.S. at 92 ("Moreover, any readjustment of purchasing patterns which such orders might require of purchasers who previously took unratably could seriously impair the Federal Commission's authority to regulate the intricate relationship between the purchasers' cost structures and eventual costs to wholesale customers who sell to consumers in other States."). However, the core concern in both cases was the comprehensive nature of the federal policy. See Transcon, 474 U.S. at 422 ("The proper question in this case is . . . whether Congress, in revising a comprehensive federal regulatory scheme to give market forces a more significant role in determining the supply, the demand, and the price of natural gas, intended to give the States the power it had denied FERC."); Northern Natural, 372 U.S. at 91 ("The federal regulatory scheme leaves no room either for direct state regulation of the prices of interstate wholesales of natural gas, or for state regulations which would indirectly achieve the same result." (citation omitted)). Because, however, the Supreme Court discussed possible conflicts between the state and federal laws in those cases, we will proceed as if such conflicts are at least relevant to the pre-emption analysis.

a single, uniform system of regulation. A separate system of state regulation is not "complementary," regardless of whether it shares other goals of the federal legislation, because it conflicts with the federal policy of uniformity.

Moreover, to hold that applying the TTPA would be complementary to the purposes of the NGA, NGPA, and WDA would ignore a key aim of the Congress in the passage of the latter two of those acts: the removal of restrictive regulations on the interstate market for natural gas wholesales. The common thread within the NGPA and the WDA – as well as subsequent FERC actions – is an overriding skepticism of government's ability to intervene beneficially in the wholesale natural gas market. Whether Congress and FERC have gone too far is not for us to decide.

It is true that a goal of the TTPA is to assure that market forces function in a competitive manner – a purpose also attributable to NGPA and WDA deregulation, insofar (and only insofar) as Tennessee and federal law share the same view of what it means for a market to be competitive. Congress's decision to deregulate, however, was not simply a decision to endorse some abstract ideal of "competitive" markets; rather, Congress made specific decisions about what it viewed as threats to competition, what tools were necessary to counter those threats, and which portions of the market did not require government intervention. Since the enactment of the NGA, the policy of Congress appears to be the result of careful deliberation and revision – a balance between regulation and deregulation that we are not free to disturb simply because we feel that our laws also promote competition within the market.

The stated purpose of the original Natural Gas Act price controls was to assure that the regulated prices were "just and reasonable." NGA § 4(a). As Stephen Breyer and Paul W. McAvoy have written, at the core of the concern that unregulated rates were not just and reasonable was the belief that natural gas producers had exercised monopolistic or oligopolistic "market power" permitting them "to raise the price of gas to the interstate pipelines <u>above the level that competition would otherwise dictate</u>." Breyer & MacAvoy, 86 Harv. L. Rev. at 945 (emphasis added). As the Supreme Court observed in <u>Hope Natural Gas Co.</u>, "the investigations of the Federal Trade Commission had disclosed that the majority of the pipe-line mileage in the country used to transport natural gas, together with an increasing percentage of the natural gas supply for pipe-line transportation, had been <u>acquired by a handful of holding companies</u>," and "[s]tate commissions, independent producers, and communities . . . were growing quite helpless against <u>these combinations</u>." 320 U.S. at 610 (emphasis added). In other words, a driving force in the enactment of the NGA was the perception of an anti-competitive, oligopolistic market, combined with the belief that direct price regulation was an appropriate remedy. The NGA, therefore, embodied a federal determination regarding the competitiveness of the wholesale natural gas market,

the threats to that competitiveness, and the appropriate remedy to those threats.

The push to deregulate first sales was also the product of changing attitudes as to whether the natural gas market – specifically the natural gas market at the wellhead – was competitive and what regulatory framework would best enable competition. "[W]hile the question of market power played an important role in the early history of the debate over producer regulation, it ha[d] become less significant [by the early 1970s] as accumulated evidence . . . created a strong presumption that gas producers d[id] not possess monopolistic or oligopolistic market power." Breyer & MacAvoy, 86 Harv. L. Rev. at 945-46. This evidence guided Congress, in the enactment of the NGPA and the WDA, to deregulate first sales while retaining regulatory authority over other aspects of the market. Although the natural gas market has a multitude of participants – from producers to pipelines to utilities to consumers – the ultimate goal of the NGA was the "protection of <u>consumers</u> against exploitation at the hands of natural-gas companies." <u>Phillips Petroleum Co.</u>, 347 U.S. at 685 (citing <u>Hope Natural Gas Co.</u>, 320 U.S. at 610) (emphasis added). Under the original terms of the NGA, the federal government pursued this consumer protection rationale indirectly by intervening at all stages of the interstate wholesale market. The NGPA and WDA reflect a later decision that the consumer would be better served, and with fewer unwanted negative consequences, by the regulation of only a portion of the wholesale market, while leaving unregulated the aspects of the wholesale market – first sales – that appeared to be adequately competitive. Those later enactments, therefore, also reflected a detailed federal determination of the appropriate posture toward competition in the wholesale market.

In short, the NGA, the NGPA, and the WDA were the result of Congress's resolution of three core issues: first, what it means for a market to be competitive; second, whether the wholesale natural gas market, if free from regulation, would comply with that definition of "competitive"; and third, what the best mechanism was for correcting any flaws in that market. It is not, therefore, enough to say that both state and federal government are interested in "competition" and conclude that our laws are complementary. The relevant federal legislation reflects not just a broad commitment to competition, but specific policy answers to a number of difficult questions, such as when government intervention will be more damaging than nonintervention and which methods of intervention will be most effective without causing too much disruption. Because, as we have found, Congress enacted a broad regime of field pre-emption, we cannot substitute our judgment for that of Congress on those issues any more than we could substitute our judgment on the question of whether competition is desirable at all.

Our Court of Appeals based its holding on another Ninth Circuit case, <u>E. & J. Gallo Winery v. EnCana Corp.</u> In that case, the Ninth Circuit considered claims much like the claims here, explicitly rejecting a similar field pre-emption argument, 503 F.3d at 1046, and

remanding the case to "consider Gallo's claims to the extent they are based on rates that are not FERC-authorized rates," id. at 1049. If, therefore, we were bound to follow E. & J. Gallo Winery, we would be inclined to agree with the Court of Appeals; however,

> [t]he Supreme Court of the United States has appellate jurisdiction over federal questions arising either in state or federal proceedings, and by reason of the supremacy clause the decisions of that court on national law have binding effect on all lower courts whether state or federal. On the other hand, because lower federal courts exercise no appellate jurisdiction over state tribunals, decisions of lower federal courts are not conclusive on state courts.

United States ex rel. Lawrence v. Woods, 432 F.2d 1072, 1075-76 (7th Cir. 1970). E. & J. Gallo Winery, therefore, is only persuasive authority.

In that case, the Ninth Circuit dealt primarily with the filed rate doctrine, addressing only briefly the topic of field pre-emption and the holding in Transcon. Compare 503 F.3d 1033-46 with id. at 1046. The court relied on an argument we have rejected here, that antitrust law is complementary to the purposes of the NGA, NGPA, and WDA. Id. at 1046. Our view is different. The application of our state's antitrust law to the circumstances here would undermine two essential purposes of the federal legislation: uniformity and freedom from government interference. Moreover, we believe that the Ninth Circuit mistakenly framed the relevant issue as whether "Congress's removal of FERC's jurisdiction over first sales . . . preempt[s] the type of claims brought by Gallo." Id. As previously stated, the determinative issue is not whether Congress enacted a new regime of field pre-emption through the NGPA or WDA. Instead, the question is whether Congress eliminated or reduced the scope of the field pre-emption established decades earlier by the NGA, and – if the revisions did not eliminate or reduce the field of pre-emption – whether the claims would be pre-empted as infringing upon that long-standing, broad field of exclusive federal legislation. For these reasons, we decline to adopt the rationale of the Ninth Circuit Court of Appeals as to their determination that field pre-emption did not preclude a state action.

Finally, although the Plaintiffs have focused chiefly on the arguments that prevailed in E. & J. Gallo Winery, we will address an argument that they advanced both in the trial court and in our Court of Appeals; that is, that their claims are not pre-empted because they are based on consumer transactions, rather than sales for resale. We simply disagree. As indirect purchasers, they are ultimately challenging wholesale prices. See Freeman Indus., 172 S.W.3d at 517-20. Their claims, therefore, necessarily intrude upon the federal domain, even if the transactions to which they were direct parties fell outside the scope of the NGA. Such claims are pre-empted.

-30-

**Conclusion**

We conclude, therefore, that the Plaintiffs' claims under the TTPA have been pre-empted by federal law.[10]  As a result, they have not stated a claim upon which relief can be granted.  The chancery court properly dismissed their complaint.  In reaching this conclusion, we are acutely aware that field pre-emption is a powerful tool by which the federal government may constrain the exercise of state authority, and that, therefore, courts must exercise the utmost caution before application of the doctrine.  Nevertheless, our overriding duty is fealty to the decisions of the Supreme Court in an area of law that is undeniably federal in character.  In Northern Natural, the Supreme Court set forth a broad field of pre-emption in natural gas cases.  In Transcon, using logic that is no less applicable to the WDA, the Supreme Court ruled that field pre-emption continued to reach transactions that had been deregulated by the NGPA.  Finally, in Schneidewind, the Supreme Court held that the field of pre-emption not only precluded direct price controls and ratable taking requirements, but extended to many regulations with an indirect bearing on prices.  Although plausible arguments were made in each of these cases for a broader reading of state authority, we are bound to follow the path set out by the Supreme Court.

For that reason, the judgment of the Court of Appeals is reversed and costs are assessed to the Plaintiffs, for which execution may issue if necessary.

_____
GARY R. WADE, JUSTICE

---

[10]  Because we decide this case on the question of field pre-emption, we have not considered the parties' filed rate doctrine arguments. We also decline to reconsider Tennessee's pleading standards, as some of the Defendants have urged.

-31-