FILED
04/28/2025
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
November 7, 2024 Session

## METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY v. GOVERNOR BILL LEE ET AL.

**Appeal from the Chancery Court for Davidson County**
**No. 23-0778-II          Anne C. Martin, Chancellor[1]**

_____

**No. M2023-01678-COA-R3-CV**

_____

In this dispute, the trial court found that certain subsections of 2023 Tennessee Public Acts, chapter 488, violated the home rule amendment and the equal protection guarantee found in the Tennessee Constitution. The defendants, who are officials of the State of Tennessee, have appealed the trial court's ruling. Following our thorough review, we affirm the trial court's determination that section two of the act is unconstitutional. However, we reverse the trial court's determination that sections two, six, seven, eight, and nine of the Act violate the equal protection guarantee found in the Tennessee Constitution. We therefore also reverse the trial court's elision of sections six, seven, eight, and nine from the statute.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which W. NEAL MCBRAYER and JEFFREY USMAN, JJ., joined.

Jonathan Skrmetti, Attorney General and Reporter; J. Matthew Rice, Solicitor General; and Philip Hammersley, Assistant Solicitor General, for the appellants, Governor Bill Lee, Speaker of the Senate Randy McNally, and Speaker of the House Cameron Sexton.

Wallace W. Dietz, Metropolitan Director of Law; Melissa Roberge; Michael Dohn; Robert E. Cooper, Jr.; and Wesley S. Love, Nashville, Tennessee, for the appellee, Metropolitan Government of Nashville and Davidson County.

---

[1] Pursuant to Tennessee Code Annotated § 20-18-101, the Tennessee Supreme Court appointed a three-judge panel to preside over this case. The trial court panel was composed of Chancellor Anne C. Martin, Judge Mark L. Hayes, and Judge Zachary R. Walden. Chancellor Martin served as chief judge of the panel.

**OPINION**

## I. Factual and Procedural History

This appeal arises from a lawsuit filed by the Metropolitan Government of Nashville and Davidson County ("Metro Nashville") against Governor Bill Lee, Speaker of the Senate Randy McNally, and Speaker of the House Cameron Sexton (collectively, "the State"), as well as the Metropolitan Nashville Airport Authority ("MNAA"). The State has appealed an order granting partial summary judgment in favor of Metro Nashville and ruling that certain provisions of a state law concerning the governance of municipal airport authorities were unconstitutional. MNAA did not appeal the trial court's order.

In 2023, the Tennessee General Assembly amended the existing Metropolitan Airport Authority Act, which provided that "[a]ny city or metropolitan government having a population of not less than one hundred thousand (100,000), or any county including any such city, may create a metropolitan airport authority in the manner provided in this section." Tenn. Code. Ann. § 42-4-104(a) (West October 1, 2007, to current). The parties agree that four metropolitan airport authorities have been created in Tennessee since passage of the Metropolitan Airport Authority Act: the Chattanooga Metropolitan Airport Authority, the Memphis-Shelby County Airport Authority, the Metropolitan Knoxville Airport Authority, and MNAA. Once an airport authority was created, the act formerly provided that "[t]he governing body of the authority shall be a board of commissioners . . . appointed by the executive officer of the creating municipality and approved by its governing body[.]" Tenn. Code Ann. § 42-4-105(a)(1)(A) (West October 1, 2007 to July 1, 2023).

The 2023 amendment to the Metropolitan Airport Authority Act, 2023 Tennessee Public Acts, chapter 488 ("the Act"), in section two, contained the following provision vacating the existing boards governing the airport authorities in counties meeting certain requirements:

> The board of commissioners of the authority in a county having a metropolitan form of government with a population of more than five hundred thousand (500,000), according to the 2020 federal census or a subsequent federal census, is vacated and reconstituted to consist of eight (8) commissioners as follows:
>
> > (i)    Two (2) persons to be appointed by the speaker of the house of representatives;
> >
> > (ii)   Two (2) persons to be appointed by the speaker of the senate;

- 2 -

(iii)    Two (2) persons to be appointed by the governor; and

(iv)    Two (2) persons appointed by the mayor of the county having the metropolitan form of government[.]

2023 Tenn. Pub. Acts, ch. 488, § 2(1)(A). This section of the Act took effect on July 1, 2023, and there is no dispute that the only county that met the population and form-of-government requirements at that time was Davidson County. Accordingly, the Act required that the current board of MNAA be vacated.

Subsection 2(1)(C) of the Act provides for staggered end dates for the terms of each of the newly appointed commissioners:

(i)    Commissioners appointed under subdivision (d)(1)(A)(iii) serve initial terms that expire on June 30, 2025;

(ii)    Commissioners appointed under subdivision (d)(1)(A)(i) serve initial terms that expire on June 30, 2026;

(iii)    Commissioners appointed under subdivision (d)(1)(A)(ii) serve initial terms that expire on June 30, 2027; and

(iv)    Commissioners appointed under subdivision (d)(1)(A)(iv) serve initial terms that expire on June 30, 2028[.]

2023 Tenn. Pub. Acts, ch. 488, § 2(1)(C). Other sections of the Act grant these new boards the authority to, *inter alia*, exercise eminent domain powers, regulate aircraft hazards, and control sections of public streets and public utilities via license or easement. *See* 2023 Tenn. Pub. Acts, ch. 488, §§ 3-9. The Act does contain a severability clause. 2023 Tenn. Pub. Acts, ch. 488, § 10.

On June 12, 2023, Metro Nashville filed a complaint in the Davidson County Chancery Court ("trial court") against Governor Lee, Speaker McNally, and Speaker Sexton in their official capacities as officers of the State of Tennessee. In the complaint, Metro Nashville alleged that the Act violated Article XI, Section 9 of the Tennessee Constitution, known as the "Home Rule Amendment." Metro Nashville asserted that pursuant to the Home Rule Amendment, any act passed by the General Assembly that was only applicable to a particular county was void unless approved by the local legislative body or voters. Metro Nashville further argued that the Act only applied to it inasmuch as Metro Nashville was the sole county that met the population and government-form criteria found in the statute. Metro Nashville posited that there was "no reasonable expectation that the Act will apply to any other local government's airport authority absent future legislative action" and that the Act was therefore void under

Article XI, Section 9. Metro Nashville also alleged that the Act violated the equal protection provision found in Article XI, Section 8 of the Tennessee Constitution by "treat[ing] the [Nashville International Airport] differently than any other metropolitan airport authority in the State for no rational purpose."

Metro Nashville concomitantly filed a notice, pursuant to Tennessee Supreme Court Rule 54, that a three-judge panel should be assigned to adjudicate this matter based on Tennessee Code Annotated § 20-18-101(a), which requires that all civil actions that (1) challenge the constitutionality of a state statute, (2) include a claim for declaratory or injunctive relief, and (3) are filed against a state official in his or her official capacity, be heard by a three-judge panel appointed by the Tennessee Supreme Court. On June 27, 2023, the Tennessee Supreme Court found that the present matter met these criteria and assigned a three-judge panel to hear the case.

On June 15, 2023, MNAA filed a motion to intervene as a party defendant, which the trial court later granted. On June 30, 2023, Metro Nashville amended its complaint to add an additional claim: that the Act violated the Tennessee Constitution's "Anti-Ripper Clause" by ripping county officials from their offices when the Act vacated MNAA's current board of commissioners and abridged their terms of office. By motion filed on the same date, Metro Nashville sought a temporary injunction prohibiting enforcement of the Act's provisions that disbanded the current MNAA board and reappointed board members pursuant to the guidelines set forth in section two of the Act. By order entered on July 31, 2023, the trial court denied Metro Nashville's request for a temporary injunction, holding that the motion was untimely because Metro Nashville waited until nearly six weeks after the law was enacted to seek the injunction. The trial court made no findings as to the merits of Metro Nashville's constitutional claims.

On August 25, 2023, MNAA filed a motion seeking a grant of summary judgment concerning the claims asserted by Metro Nashville insofar as those claims sought to invalidate any portions of the Act other than section two. MNAA took no position as to the constitutionality of section two; instead, MNAA argued that the trial court should find the remainder of the Act constitutional because the remaining sections "supplement and/or clarify the rights, obligations, and authority of relevant metropolitan airport authorities with respect to land use and other matters." MNAA asserted that the remaining sections of the Act (1) were not local legislation because they could apply to multiple counties, (2) did not contravene a general law of mandatory statewide application, and (3) satisfied the rational basis standard. MNAA requested that the trial court uphold, pursuant to the severability clause contained in the Act, the constitutionality of the remaining sections of the Act independent of its determination as to the constitutionality of section two.

The State concomitantly filed a motion seeking a grant of summary judgment. In its motion, the State asserted that no sections of the Act violated the Tennessee

Constitution inasmuch as the Act was not local in form or effect, the Act did not "rip" Metro Nashville officers from office, and the Act satisfied rational basis analysis, thereby ensuring equal protection. The State further asserted that Metro Nashville lacked standing to bring an equal protection claim.

Metro Nashville likewise sought a grant of summary judgment. In its motion, Metro Nashville argued that the Act constituted local legislation because it only applied to one airport authority, MNAA, and was therefore unconstitutional because it lacked a local approval clause. Metro Nashville further contended that the Act removed the current MNAA board members, who were county officers, from their seats in violation of the Anti-Ripper Clause. In addition, Metro Nashville urged that the Act failed rational basis review and therefore violated equal protection.

On October 6, 2023, the trial court conducted a hearing as to all three motions for summary judgment. In a final order entered on October 31, 2023, the court found that Davidson County and Shelby County are the only two counties in Tennessee that have populations in excess of 500,000 as reported in the 2020 federal census. The court further found that the "City of Memphis and Shelby County have considered consolidating their local governments into a metropolitan government multiple times in the past but have not done so." The court observed that prior to passage of the Act, members of the old MNAA board were serving terms scheduled to expire in 2024, 2025, 2028, and 2029 but that these positions were "vacated under the terms of the Act."

The trial court also found that legislative sponsors of the Act had made certain statements before the legislature concerning the Act's purpose. Specifically, the court quoted Senator Paul Bailey, the Act's sponsor in the Senate, who stated:

> I'm more than willing to bring legislation back next year relative to all of those other airports throughout the state. In looking at that, they're not all metro-governed. They are city and county governments relative to those airports. Specifically, I had requested a lot of information regarding the Nashville Metro Airport. That's information that I structured this legislation based on. But I can assure you come next year we will be filing legislation to assist those four other airports in the state.

The court also quoted State Representative Johnny Garrett, the Act's sponsor in the House, who stated:

> I can't answer what could come down, or what might happen in the future. This legislation only relates to this particular airport, with this particular situation. There's no way I could predict or try to create a hypothetical about what might happen to the other airports. What I probably would say

is that they would want a great, sustaining relationship with the State to make sure that they have a strategic long-term plan, would be my guess.

\* \* \*

The airport authority, in the area that it is, it's not funded by that particular area. It's actually funded by the entire State of Tennessee. So the board is not representative from the entire state of Tennessee, through us, through our various speakers. They now will be representative by the board of this new airport authority from the people rather than one particular area.

The trial court noted that for the fiscal year ending June 30, 2022, MNAA received more than $29,000,000 in financial assistance from the State of Tennessee. It also received more than $26,000,000 in federal funds. However, MNAA's total operating revenue was more than $210,000,000.

With respect to its analysis of whether the Act violated the Home Rule Amendment, the trial court recounted that the "Local Legislation Clause" of the Home Rule Amendment requires that "any act passed by the General Assembly that is 'private or local in form or effect' and applies to a particular county or municipality either in its governmental or propriety capacity is void" unless, by its terms, it requires local approval. *See* Tenn. Const., art. XI, § 9, cl. 2. The court enumerated the three requirements that our Supreme Court has indicated must be satisfied concerning when a particular state law requires local approval: "(1) the statute in question must be local in form or effect; (2) it must be applicable to a particular county or municipality; and (3) it must be applicable to the particular county or municipality in either its governmental or proprietary capacity" (citing *Metro. Gov't of Nashville & Davidson Cnty. v. Tenn. Dep't of Educ*., 645 S.W.3d 141, 150 (Tenn. 2022)). Because the parties disagreed regarding whether these requirements had been satisfied in this matter, the trial court addressed each requirement in turn.

In determining whether the Act was local in form or effect, the trial court found it necessary to determine whether "this legislation was designed to apply to any other county in Tennessee." *See Farris v. Blanton*, 528 S.W.2d 549, 551 (Tenn. 1975). "[I]f it is potentially applicable throughout the state it is not local in effect even though at the time of its passage it might have applied to [one county] only." *Id.* at 552. The trial court found the critical question to be "whether the law actually is or was designed to be limited locally, and could not potentially be applicable to other localities, or throughout the state." *See id.*

Regarding the Act, the trial court determined that it was local in form and effect. The court noted that only two counties in Tennessee satisfied the population

requirement—Shelby and Davidson. The court further noted that this would remain true until release of the 2030 federal census. In addition, the court observed that of these two counties, only Davidson County had a metropolitan form of government.

The trial court next analyzed whether the Act was applicable to Metro Nashville and determined that it was, reasoning that the Act removed appointment authority for most of the board of commissioners from Metro Nashville's mayor and council. Accordingly, the court determined that the Act "governs or regulates Metro." Finally, the court determined that the third requirement, whether the statute was applicable to Metro Nashville in either its governmental or proprietary capacity, had also been met. The court stressed that Metro Nashville had exercised its governmental authority in establishing MNAA as its board and in appointing members thereto. The court found that the Act stripped Metro Nashville of that power. Based on these findings, the court granted summary judgment in favor of Metro Nashville on this issue, determining that section two of the Act violated the Home Rule Amendment and was unconstitutional.

The trial court then proceeded to analyze whether the statute violated the Anti-Ripper Clause found in the Home Rule Amendment. The court explained that "ripper" bills "target particular local offices by altering their existing salaries, shortening their terms, or removing incumbents from office." *See Frazer v. Carr*, 360 S.W.2d 449, 456 (Tenn. 1962). The court noted that the State had also contested whether Metro Nashville maintained standing to bring an Anti-Ripper claim because Metro Nashville and MNAA were distinct entities.

With respect to standing, the trial court determined that the commissioners of MNAA's board were officers of Metro Nashville because MNAA carried out "public, governmental functions on behalf of Metro as its instrumentality." The court also observed that the commissioners were appointed by Metro Nashville's chief executive and approved by its legislative body. The court therefore concluded that Metro Nashville maintained standing to bring this claim. Having already found that the Act was local in effect and also finding that it prematurely removed county officers from their offices, the court determined that section two of the Act violated the Anti-Ripper Clause.

Finally, regarding the equal protection claim, the trial court determined that Metro Nashville had standing to assert the claim predicated on prior case law providing that "the provisions of Article I, Section 8, protect cities and counties as well as individuals." *See Civ. Serv. Merit Bd. of Knoxville v. Burson*, 816 S.W.2d 725, 731 (Tenn. 1991). Applying rational basis review, the court found that sections two, six, seven, eight, and nine of the Act violated the equal protection guarantee found in the Tennessee Constitution because those sections treated MNAA differently from other airport authorities without a reasonable relationship to a legitimate state interest. Furthermore, based on the severability clause found in the Act, the court determined that it could "elide the offending provisions" that it had found to be unconstitutional. The court therefore

granted Metro Nashville's summary judgment motion in part and declared its order to be final. The State timely appealed.

## II. Issues Presented

The State presents the following issues for our review, which we have restated slightly:

1.  Whether the trial court erred by determining that section two of the Act violated the Local Legislation Clause of the Home Rule Amendment.

2.  Whether the trial court erred by determining that section two of the Act violated the Anti-Ripper Clause of the Home Rule Amendment.

3.  Whether the trial court erred by determining that section two and sections six through nine of the Act violated the equal protection guarantee found in the Tennessee Constitution.

## III. Standard of Review

The grant or denial of a motion for summary judgment is a matter of law; therefore, our standard of review is *de novo* with no presumption of correctness. *See Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 250 (Tenn. 2015); *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 671 (Tenn. 2013) (citing *Kinsler v. Berkline, LLC*, 320 S.W.3d 796, 799 (Tenn. 2010)). As such, this Court must "make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied." *Rye*, 477 S.W.3d at 250. As our Supreme Court has explained concerning the requirements for a movant to prevail on a motion for summary judgment pursuant to Tennessee Rule of Civil Procedure 56:

> [W]hen the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered

paragraph and supported by a specific citation to the record." *Id.* When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. [574,] 586, 106 S. Ct. 1348, [89 L. Ed. 2d 538 (1986)]. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye*, 477 S.W.3d at 264-65. Pursuant to Tennessee Rule of Civil Procedure 56.04, the trial court must "state the legal grounds upon which the court denies or grants the motion" for summary judgment, and our Supreme Court has instructed that the trial court must state these grounds "before it invites or requests the prevailing party to draft a proposed order." *See Smith v. UHS of Lakeside, Inc.*, 439 S.W.3d 303, 316 (Tenn. 2014). "Whether the nonmoving party is a plaintiff or a defendant—and whether or not the nonmoving party bears the burden of proof at trial on the challenged claim or defense— at the summary judgment stage, '[t]he nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party.'" *TWB Architects, Inc. v. The Braxton, LLC*, 578 S.W.3d 879, 889 (Tenn. 2019) (quoting *Rye*, 477 S.W.3d at 265).

The trial court granted summary judgment in part, determining that portions of the Act were unconstitutional. Because constitutional issues are inherently questions of law, our review of those issues is *de novo*. *See State v. Robinson*, 29 S.W.3d 476, 480 (Tenn. 2000) ("As the constitutionality of a statute is a question of law, our review is de novo

without a presumption of correctness given to the lower courts' judgments."). Tennessee courts generally presume the constitutionality of statutes enacted by the legislature. *See Gallaher v. Elam*, 104 S.W.3d 455, 459 (Tenn. 2003) ("In evaluating the constitutionality of a statute, we begin with the presumption that an act of the General Assembly is constitutional."). Accordingly, we must "indulge every presumption and resolve every doubt in favor of the statute's constitutionality." *Id.* (quoting *State v. Taylor*, 70 S.W.3d 717, 721 (Tenn. 2002)).

## IV. Section Two and the Local Legislation Clause

The Local Legislation Clause found within the Home Rule Amendment provides:

> [A]ny act of the General Assembly private or local in form or effect applicable to a particular county or municipality either in its governmental or its proprietary capacity shall be void and of no effect unless the act by its terms either requires the approval by a two-thirds vote of the local legislative body of the municipality or county, or requires approval in an election by a majority of those voting in said election in the municipality or county affected.

Tenn. Const. art. XI, § 9, cl. 2. Our Supreme Court has previously explained that "the Home Rule Amendment was added 'to strengthen local self-government.'" *Metro. Gov't of Nashville & Davidson Cnty. v. Tenn. Dep't of Educ.*, 645 S.W.3d 141, 149 (Tenn. 2022) (quoting *Burson*, 816 S.W.2d at 728-29). As the High Court has summarized:

> In 1953, the Constitution was amended to permit municipal governments to adopt and operate under home rule authority, *see* Tenn. Const. art. XI, § 9, and as this Court has previously recognized, "'[t]he whole purpose of the Home Rule Amendment was to vest control of local affairs in local governments.'" *Burson*, 816 S.W.2d at 729 (Tenn. 1991) (quoting *Farris v. Blanton*, 528 S.W.2d 549, 551 (Tenn. 1975)). The effect of the home rule amendments was to fundamentally change the relationship between the General Assembly and these types of municipalities, because such entities now derive their power from sources other than the prerogative of the legislature.

*S. Constructors, Inc. v. Loudon Cnty. Bd. of Educ.*, 58 S.W.3d 706, 714 (Tenn. 2001) (footnote omitted).

Our Supreme Court further determined that three requirements must be met for the Home Rule Amendment to be implicated: "1) the statute in question must be local in form or effect; 2) it must be applicable to a particular county or municipality; and 3) it must be applicable to the particular county or municipality in either its governmental or

proprietary capacity." *Metro. Gov't*, 645 S.W.3d at 150. If the Act implicates the Home Rule Amendment and does not require approval by a majority of the county or municipality's local legislative body or voters, it is unconstitutional and void. *See id.*

## A. Local in Form or Effect

The first requirement for applicability of the Home Rule Amendment is that the statute in question be "local in form or effect." *See Metro. Gov't*, 645 S.W.3d at 150. As our Supreme Court has explained concerning this requirement:

> The test is not the outward, visible or facial indices, nor the designation, description or nomenclature employed by the Legislature. Such a criterion would emasculate the purpose of the amendment. The whole purpose of the Home Rule Amendment was to vest control of local affairs in local governments, or in the people, to the maximum permissible extent. The sole constitutional test must be whether the legislative enactment, irrespective of its form, is local in effect and application.
>
> * * *
>
> Within the framework of the test hereinabove announced we must determine whether this legislation was designed to apply to any other county in Tennessee, for if it is potentially applicable throughout the state it is not local in effect even though at the time of its passage it might have applied to Shelby County only. But in determining potential applicability we must apply reasonable, rational and pragmatic rules as opposed to theoretical, illusory or merely possible considerations.

*Farris*, 528 S.W.2d at 551-52.

In *Farris*, our Supreme Court was asked to rule upon the constitutionality of a statute that applied to counties with a mayor as head of the county's executive branch. *Id.* at 553. At the time the statute was enacted, Shelby County was the only county in Tennessee that met that criterion. *See id.* at 552. Shelby County's government was structured in this manner due to a private act of the legislature, and the Supreme Court noted that "[n]o other county may have such a form of government except by the affirmative action of the General Assembly." *Id.* Accordingly, the High Court concluded that the statute in question related only to Shelby County and thus was local in effect. *See id.* at 556. In so ruling, the Court noted that it could not "conjecture what the law may be in the future" and could not "speculate upon the future action of the General Assembly" with respect to forms of government in other counties. *See id.* at 555.

- 11 -

In subsequent cases, our Supreme Court has upheld the constitutionality of a statute containing a county population minimum, which resulted in only two counties meeting the criterion, *see Bozeman v. Barker*, 571 S.W.2d 279, 280 (Tenn. 1978), as well as a statute containing a form-of-government requirement in addition to a population requirement, which resulted in only one county meeting the criteria, *see Burson*, 816 S.W.2d at 728. As the Court explained in *Burson*:

> Not every statute that affects a single county will automatically be found to be unconstitutional, however. For example, we have upheld legislation that applied only to counties with a metropolitan form of government, even though Davidson County was at the time the only county in the state with a consolidated, metropolitan form of government. *See Doyle v. Metropolitan Government*, 225 Tenn. 496, 471 S.W.2d 371 (1971); *see also Metropolitan Government of Nashville & Davidson County v. Reynolds*, 512 S.W.2d 6, 9-10 (Tenn. 1974) (dictum).[2] Those cases have been successfully distinguished from *Farris v. Blanton* on the ground that enabling provisions for the creation of metropolitan government were extant and potentially available to all counties statewide, whereas the unique form of mayor-county government involved in *Farris v. Blanton* was created by private act, and no similar enabling provisions existed. *Farris v. Blanton*, 528 S.W.2d at 554-555.

> Likewise, in *Bozeman v. Barker*, 571 S.W.2d 279 (Tenn. 1978), we upheld a statute that was, by its terms, applicable to all counties having a population between 275,000 and 600,000. *Id.* at 280. At the time of its passage, the statute affected only Davidson County and Knox County. But we noted that the legislation was "public and general" both in form and effect, because it "applie[d] to two populous counties" at that time and could "become applicable to many other counties depending on subsequent population growth." *Id.* at 282.

*Id.* at 729-30. The Court in *Burson* therefore determined that the statute was not unconstitutional because it was of general application. *Id.* at 730.

In the case at bar, however, section two of the Act contains three limiting criteria:

1.      It applies to counties that have established a metropolitan airport authority;

---

[2] As noted, the *Reynolds* Court expressly stated, upon the filing of a petition to rehear, that the portion of its opinion addressing the constitutionality of the subject statute was "clearly obiter dictum and is not binding under the doctrine of stare decisis." *See* 512 S.W.2d at 10. We further observe that the statute at issue in *Doyle* contained a provision requiring approval by the local legislative body. *See* 471 S.W.2d at 499.

2.     It applies to counties that have a population exceeding 500,000 "according to the 2020 federal census or a subsequent federal census"; and

3.     It applies to counties that have a metropolitan form of government.

*See* 2023 Tenn. Pub. Acts, ch. 488, § 2(1)(A). As the trial court found, the only county in Tennessee that met all three criteria at the time of the Act's enactment was Davidson County. In addition, section two of the Act provided that the metropolitan airport authority board of any county meeting the above conditions would immediately be vacated and a new board appointed, whose members would serve staggered terms ending in 2025, 2026, 2027, and 2028. *See* 2023 Tenn. Pub. Acts, ch. 488, § 2(1)(C).

In determining that this section of the Act was local in form or effect, the trial court relied heavily on an opinion issued by the United States District Court for the Western District of Tennessee—*Bd. of Educ. of Shelby Cnty., Tenn. v. Memphis City Bd. of Educ.*, 911 F. Supp. 2d 631 (W.D. Tenn. 2012). Although we recognize that this federal precedent is merely persuasive authority, *see Leggett v. Duke Energy Corp.*, 308 S.W.3d 843, 871 (Tenn. 2010), we also find the *Bd. of Educ. of Shelby Cnty.* case to be particularly well-reasoned and its analysis instructive to the issue herein.

In *Bd. of Educ. of Shelby Cnty.*, the statute in question dealt with the formation of municipal school districts. *See* 911 F. Supp. 2d at 639. As the district court explained: "Chapter 905 establishes three separate but necessary criteria for the creation of municipal school districts. Population is only one criterion; it is not the focus of the classification created by the Tennessee General Assembly." *Id.* at 657. In analyzing whether the statute was therefore applicable "throughout the state," *see Farris*, 528 S.W.2d at 552, the district court explained:

> "Throughout the state" is more appropriately understood as throughout the class created by the Tennessee General Assembly. If the class created by a statute is so narrowly designed that only one county can reasonably, rationally, and pragmatically be expected to fall within that class, the statute is void unless there is a provision for local approval.

*Bd. of Educ. of Shelby Cnty.*, 911 F. Supp. 2d at 656.

Based on the statute's three conditions for applicability in *Bd. of Educ. of Shelby Cnty.*, the district court determined that only Shelby County could meet all three criteria. *Id.* at 657. Acknowledging that our Supreme Court had previously held that statutes conditioning applicability on certain criteria were not unconstitutional, the district court clarified that it had to "address [the statute] in its entirety, applying reasonable, rational,

- 13 -

and pragmatic rules of construction to determine its potential application to counties other than Shelby." *Id.* Addressing arguments by the parties that at least one other county could meet the statute's criteria if certain actions were undertaken by those counties, the district court stated:

> Given Gibson County's "unique method of operating and funding education," the absence of a county school system, Milan SSD's bond indebtedness, and the unlikelihood that Milan SSD will abolish its school system, the application of Chapter 905 to Gibson County exists only in theory. *Farris* instructs courts to refrain from entertaining theories. *See Farris*, 528 S.W.2d at 552. The "group of conditions" in Chapter 905 is "so unusual and particular" that "only by a most singular coincidence could [it] be fitted to [Gibson County]." *See In re Elm St.*, 246 N.Y. 72, 158 N.E. 24, 26 (1927). Applying reasonable, rational, and pragmatic rules, Chapter 905 does not and will not apply to Gibson County.
>
> * * *
>
> The Municipalities and the State contend that municipalities in Carroll County will fall under Chapter 905 as they grow. This is not a population threshold case. The appropriate inquiry is not simply whether Chapter 905 can "become applicable to many other counties depending on subsequent population growth." *Burson*, 816 S.W.2d at 730. The application of all of Chapter 905's conditions must be reasonable, rational, and pragmatic. *See Farris*, 528 S.W.2d at 552. Even considering population growth alone, Dr. Swanson's testimony establishes that the possibility of municipalities in Carroll County falling under Chapter 905 is so unlikely as to be nonexistent.

*Id.* at 659. The district court concluded its analysis by stating: "We close our eyes to realities if we do not see in [Chapter 905] the marks of legislation that is special and local in terms and in effect" (quoting *In re Elm St.*, 158 N.E. 24, 26 (N.Y. 1927)). "Chapter 905 was tailored to address unique circumstances that had arisen in Shelby County. The conditions to which it applies are 'so unusual and particular [and] precisely fitted' to Shelby County, that 'only by a most singular coincidence could [it] be fitted to any other [county].'" *Id.* at 660 (quoting *In re Elm St.*, 158 N.E. at 26). The district court therefore determined that because the statute contained no provision for local approval, it was unconstitutional pursuant to the Home Rule Amendment. *See id.*

Similarly, here, the trial court determined that "the timeframe provided in Section 2(1)(C), when read in conjunction with the limitations of Section 2(1)(A), establishes a closed class of counties that encompasses only Davidson County and Shelby County." The court continued:

- 14 -

Only Davidson County presently satisfies all the criteria. And other than Davidson, only Shelby satisfies the population requirement in a federal census prior to the dates provided in Section 2(1)(C). Thus, no other county in Tennessee, even if it consolidates into a metropolitan form of government, could come within the purview of the Act until the release of the 2030 federal census. Section 2(1)(C), however, provides for the terms of the newly appointed board members to "expire on June 30, 2025," "June 30, 2026," "June 30, 2027," and "June 30, 2028." 2023 Pub. Acts ch. 488, § 2(1)(C). Section 2(1)(C) therefore could never apply to any county besides Davidson or Shelby. A statute is not applicable or potentially applicable statewide simply because it applies or could apply to more than one county. The question is whether the Act applies to a class that remains open to encompass additional counties. *See Doyle*, 471 S.W.2d 371 at 373 ("This Act is not in its purport nor in its substance 'private or local in form or effect' and in addition it is quite apparent that this Act applies throughout the State to all those who desire to come within its purview. 'It is a general rule that "a statute which relates to persons or things as a class, is a general law, while a statute which relates to particular persons or things of a class is special."'"). And the class here encompassed by Section 2(1)(C) is closed to all but Davidson and, should it desire rather soon to be included, Shelby County. Section 2(1)(C) is consequently local in form or effect. *See Farris*, 528 S.W.2d at 552.

Second, the layering of two criteria to exclude counties besides Davidson County distinguishes the Act from the statute at issue in *Burson*. While it is true "that enabling provisions for the creation of metropolitan government [remain] extant and potentially available to all counties statewide," *Burson*, 816 S.W.2d at 729, the additional criterion for applicability of population renders such application only "theoretically . . . possible." *Bd. of Educ. of Shelby Cnty.*, 911 F. Supp. 3d at 652 (quoting *Farris*, 528 S.W.2d at 552). A theoretical application does not satisfy Article XI, Section 9.

We agree with the trial court's analysis. Based on the three criteria specified in section two of the Act, Davidson County is the only county in Tennessee that meets all three criteria.

With regard to the first criterion—that the county has established a metropolitan airport authority—only four counties meet this condition: Davidson, Shelby, Knox, and Hamilton. Respecting the second criterion—that the county have a population exceeding 500,000 "according to the 2020 federal census or a subsequent federal census"—only two counties, Shelby and Davidson, met this condition as of the 2020 federal census.

- 15 -

Finally, concerning the third criterion—that the county have a metropolitan form of government—Davidson County was the only remaining county that met the final condition.

Although the original Metropolitan Airport Authority Act was enacted in 1969, only four counties have established metropolitan airport authorities since that time. Assessing the likelihood or immediacy of other counties doing so would be clear speculation. In addition, although there will likely be population growth in other counties, a new federal census will not be released until 2030 at the earliest. Given the timeframes set forth in section two of the Act for expiration of the new board members' initial terms, the only other county that could meet the population threshold within those timeframes was Shelby. No other county in Tennessee could possibly comply with the population requirement until 2030. Most importantly, of the counties meeting the first two requirements, Davidson County is the only county with a metropolitan form of government. No evidence was presented that Shelby County had impending plans to adopt such a form of government. Accordingly, the layering of the statute's applicability requirements renders the possibility that the Act could apply to any other county theoretical at best. We therefore conclude that the trial court correctly determined section two of the Act to be local legislation.

### B. Applicability to a Particular County or Municipality

The second requirement, that section two of the Act "must be applicable to a particular county or municipality," has been described as requiring that the statute "regulate" or "govern" that county or municipality. *See Metro. Gov't*, 645 S.W.3d at 152. As our Supreme Court has explained:

> It goes without saying that, among the many functions a statute may have, one primary function is to govern or regulate not only certain subject matters—such as education—but particular classes of people or entities. *See, e.g.*, *State v. Blockman*, 615 S.W.2d 672, 674-75 (Tenn. 1981). This Court has previously stated that "[r]egulate, as defined by lexicographers, is to adjust by rule or method, to direct, to rule, to govern, to methodize, to arrange. Every element of this definition involves restraint, *the exercise of a power over a thing by which its activities are ruled or adjusted, or directed to certain ends*." *State ex rel. Saperstein v. Bass*, 177 Tenn. 609, 152 S.W.2d 236, 238 (1941) (emphasis added) (quoting *City of Nashville v. Linck*, 80 Tenn. 499, 512 (1883)); *see also Silverman v. City of Chattanooga*, 165 Tenn. 642, 57 S.W.2d 552, 552 (1933) ("The word regulate is defined . . . as meaning, 'to adjust or control by rule, method, or governing principles or laws.'").

*Id.*

In *Metro. Gov't*, the Supreme Court was asked to rule on the constitutionality of a statute that allowed eligible students in certain school districts to "directly receive their share of state and local education funds, which would ordinarily be provided to the public-school system they attend, to pay for a private school education and associated expenses." *Id.* at 152. The Metropolitan Government of Nashville and Davidson County sought a declaration that the statute was unconstitutional, but the Supreme Court found that the statute was not "applicable to" the municipality because it did not regulate or govern it. *See id.* at 152-53. The Court rejected the municipality's argument that the statute applied to it because the statute impacted the municipality's allotment of funding to the public school system; instead, the Court concluded that the statute regulated only the local education agency's conduct regarding its counting of enrolled students. *See id.* The Court further noted that the municipality's obligation to fund the local education agency derived from a different statutory scheme. *Id.* Accordingly, the Court concluded:

> We simply do not agree with Plaintiffs that the effects of the interplay between the [statute in question's] counting requirement and the statutes establishing their funding obligations are enough to trigger the application of the Home Rule Amendment. While Plaintiffs may be affected by the Act, we do not agree with the dissent that this is enough to render the ESA Act "applicable to" them for purposes of the Home Rule Amendment.
>
> The Court also rejects the trial court's finding that Plaintiffs are so intimately related to their respective [local education agencies] as to render them one and the same, thus making the ESA Act applicable to Plaintiffs. This argument is contrary to this Court's long-standing precedent with respect to the structure and operation of the educational system under Tennessee law. That jurisprudence establishes beyond refute that the [local education agencies] are distinct from the county or municipal governments. *See State ex rel. Weaver v. Ayers*, 756 S.W.2d 217, 225 (Tenn. 1988) (describing the distinct roles and responsibilities of the State, the county boards of education, and the county governments, and noting the limited role of the county governments in the provision of education in Tennessee); *see also Putnam Cnty. Educ. Ass'n. v. Putnam Cnty. Comm'n.*, No. M2003-03031-COA-R3-CV, 2005 WL 1812624, at *4-5 (Tenn. Ct. App. Aug. 1, 2005) (noting the separate origins, functions, and management of county governments and local boards of education); *Rollins v. Wilson Cnty. Gov't*, 154 F.3d 626, 630 (6th Cir. 1998) ("Under Tennessee law, the school systems are separate from the county governments. The two entities have separate origins, functions, and management."). The separateness of Plaintiffs and their respective [local education agencies] is not ameliorated by their financial connections. As another panel of the Court of Appeals noted in a decision only months before that court's decision in this case,

"[c]ounties and school systems perform separate functions. The fact that there are financial connections between a local school system and local government does not detract from the essentially separate functions of these two entities." *Young v. Stamey*, No. E2019-00907-COA-R3-CV, 2020 WL 1452010, at *8 (Tenn. Ct. App. Mar. 25, 2020) (citation omitted).

This argument also is contrary to the Court's precedent establishing that, while county boards of education operate in a sense as county government entities through their role in the educational partnership between themselves, the State, and the county governments, the county boards of education themselves are not bestowed with home rule authority. *See S. Constructors*, 58 S.W.3d at 715 n.10. In the absence of home rule authority, [local education agencies] cannot logically be deemed to be endowed with the protection of the Home Rule Amendment.

*Id.* at 153-54 (footnotes omitted).

In a footnote to the *Metro. Gov't* opinion, the Supreme Court rejected the municipality's argument that the statute in question was "applicable to" it because the statute would affect the municipality's funding obligation to the public school system. The Court articulated:

Plaintiffs ask that the Court effectively read the phrase "applicable to" as synonymous with the phrase "having an effect on." We reject this construction. Such a construction would require the Court to assume that the drafters of the Home Rule Amendment were imprecise in their choice of two distinct terms, "applicable" and "effect," within the very same provision of the Constitution, and that the drafters did not intend each of those terms to have a specific purpose and meaning. We decline to make such an assumption.

*Id.* at 153 n.13.

The Supreme Court in *Metro. Gov't* also quoted with approval an earlier opinion, *Fountain City Sanitary Dist. v. Knox Cnty. Election Comm'n*, 308 S.W.2d 482, 486 (Tenn. 1957), wherein Justice Swepson noted in his concurring opinion that "drainage districts, water districts, sanitary districts, school districts, etc.," despite being "designated quasi municipal corporations" or having "a number of powers that are similar to or the same in substance as certain powers possessed by cities," were "simply not included within the intention of the framers of the Home Rule Amendment." The High Court in *Metro. Gov't* ultimately concluded that the Home Rule Amendment was not implicated because the statute in question was not applicable to the municipality. *Metro. Gov't*, 645 S.W.3d at 154.

- 18 -

By contrast, in an earlier opinion, *Chattanooga-Hamilton Cnty. Hosp. Auth. v. City of Chattanooga*, 580 S.W.2d 322, 328 (Tenn. 1979), our Supreme Court was asked to determine whether a statutory amendment to an act that established the Chattanooga-Hamilton County Hospital Authority was constitutional pursuant to the Home Rule Amendment when it required approval by the county but not by the city. On appeal, the city asserted that because the statute in question "affect[ed] the City as well as the County," it should also have required the city's approval. The Court disagreed, stating:

> [T]he City is not substantially affected by the 1977 Act and hence their approval was not necessary to validate the Act. The essence of the 1977 Act was a more detailed catalogue of the duties, powers and operation of the Hospital Authority. <u>Nevertheless, since several sections affect the County, such as section nineteen, which declared the Hospital Authority to be a "public instrumentality acting on behalf of the County," we feel there could be an obvious basis for requiring the approval of the Hamilton County Council pursuant to Article XI, s 9, para. 2</u>.

*Id.* (emphasis added).

In the case at bar, although we find the *Metro. Gov't* decision to be instructive to our analysis of the issue before us, we do not find it to be factually on point. In *Metro. Gov't*, the statute in question only regulated the actions of the educational agency. The statute neither burdened the municipality with additional duties nor restrained it from performing any duties. *See Metro. Gov't*, 645 S.W.3d at 152-54. Accordingly, the Supreme Court concluded in that case that the Home Rule Amendment was not implicated because the statute was not applicable to the municipality. *See id.*

By contrast, here, section two of the Act does restrain Metro Nashville from performing duties that it previously had been directed to perform. Section two of the Act also imposes a duty upon Metro Nashville's mayor of appointing two MNAA board members with no oversight from Metro Nashville's "governing body."

As the trial court succinctly explained:

> [T]he Act eliminates Metro's appointment authority as it was constituted under the Original Act and replaces it with a direct appointment authority for two of the new Board's eight members invested in the office of Metro's mayor. In addition to reducing the Metro Mayor's role to appointing only two of the commissioners, this change strips Metro Council's role entirely. Previously for Metro—and as is still the case for other creating municipalities—appointments to the authority's "board of commissioners" were "approved by [the creating municipality's] governing body." *See*

- 19 -

Tenn. Code Ann. § 42-4-105(a)(1)(A); *supra* notes 5-6.  Such approval is no longer required.  *See* 2023 Pub. Acts ch. 488, § 2.  Further still, as once again previously was the case for Metro and still is for other creating municipalities,

> [a] commissioner may be removed from office by a two-thirds (2/3) vote of the governing body of the creating municipality, but only after notice of the cause of such removal has been served upon the commissioner, and only after the commissioner has been granted an opportunity for a public hearing on the cause.

Tenn. Code Ann. § 42-4-105(d)(4).   The Act, however, provides an alternate scheme for a creating municipality that meets the exclusionary criteria already discussed, i.e., Metro:

> (1) Notwithstanding this section to the contrary:
>
> . . .
>
> (G) A commissioner:
>
> . . .
>
> (ii) *May be removed by the commissioner's appointing authority with or without cause.*  A vacancy created by the removal of a commissioner is filled by the appointing authority in the same manner as the original appointment;

2023 Pub. Acts ch. 488, § 2(1)(G) (emphasis added).  Unlike the statute before the Tennessee Supreme Court in *Tennessee Department of Education*, 645 S.W.3d 141, the Act not only eliminates Metro Council's responsibilities as to MNAA but also reassigns a reduced portion of Metro's prior appointment authority for the reconstituted body to the Metro Mayor.  Both in a negative sense—removing appointment authority for most of the commissioners from the Metro Mayor and approval and removal authority from Metro Council entirely—and in a positive sense—providing the reduced appointment authority to the Metro Mayor—the Act governs or regulates Metro.  We therefore conclude the Act is applicable to Metro.

- 20 -

We agree with this analysis and find the Act to be distinguishable from the statute at issue in *Metro. Gov't* inasmuch as the Act <u>does</u> restrain Metro Nashville from performing duties that it had previously been given in the prior version of the statute. The Act only allows Metro Nashville's mayor to appoint two members, rather than the entire board, and further removes Metro Nashville council's oversight of those appointments by approval or removal power. Ergo, the Act regulates and restrains the power and duties of Metro Nashville.

Moreover, the Act, much like the statute at issue in *Chattanooga-Hamilton Cnty. Hosp. Auth.*, states that "airport authorities created pursuant to this chapter shall be public and governmental bodies acting as agencies and instrumentalities of the creating and participating municipalities[.]" Tenn. Code Ann. § 42-4-102 (West October 1, 2007, to current); *Chattanooga-Hamilton Cnty. Hosp. Auth.*, 580 S.W.2d at 328. Accordingly, we acknowledge the Supreme Court's observation in *Chattanooga-Hamilton Cnty. Hosp. Auth.* and determine that the statute herein, similar to the statute in that case, states an "obvious basis for requiring the approval of the [local legislative body] pursuant to" the Home Rule Amendment. *See* 580 S.W.2d at 328. In short, because section two of the Act regulates the power and duties of Metro Nashville, we conclude that the second requirement for implication of the Home Rule Amendment has been met. *See Metro. Gov't*, 645 S.W.3d at 150.

C. Applicability in Governmental or Proprietary Capacity

The third requirement for implication of the Home Rule Amendment is that section two of the Act must be applicable to a "particular county or municipality in either its governmental or proprietary capacity." *Metro. Gov't*, 645 S.W.3d at 150. As our Supreme Court has previously recognized, counties and municipalities act in a "dual capacity" by either exercising powers that are "public, legislative, political, or governmental" or powers that are "private, quasi-private, proprietary, business, commercial, ministerial, or merely municipal." *See Memphis Power & Light Co. v. City of Memphis*, 112 S.W.2d 817, 820 (Tenn. 1937). Ergo, this requirement encompasses the exercise of either type of municipal power. We therefore agree with the trial court that all three requirements found in *Metro. Gov't*, 645 S.W.3d at 150, have been met.

Because section two of the Act implicates the Home Rule Amendment and does not require approval by a majority of the municipality's local legislative body or voters, it is unconstitutional and void. *See Metro. Gov't*, 645 S.W.3d at 150. We therefore affirm the trial court's determination that section two of the Act violates the Local Legislation Clause.

Although the trial court ultimately elided section two from the Act, the State argues that the trial court should have simply elided section 2(1)(C) and its staggered term dates and left the remainder of section two intact. The State asserts that "elision

- 21 -

would not impair the act's ability 'to accomplish the dominant purpose . . . intended by the [legislature]'" (quoting *Citicorp Fin. Servs. Corp. v. Adams*, 674 S.W.2d 705, 709 (Tenn. 1984)), which the State concedes was to "vacate the boards of covered authorities and fill them with new commissioners." Accordingly, the State urges that eliding section 2(1)(C) would result in reversion to the term-staggering provisions found in Tennessee Code Annotated § 42-4-105(d)(1)(A) (West October 1, 2007, to June 30, 2023) as it existed prior to July 2023. The conundrum presented by this approach is that doing so would cause the newly appointed board members to serve terms of "one (1), two (2), three (3), four (4), five (5), six (6) and seven (7) years, respectively." *See id.* As denoted by the word, "respectively," these staggered terms corresponded with the seven-person board provided for in the prior version of the statute as opposed to the eight-person board provided for in the current version of the statute. Accordingly, as Metro Nashville succinctly states, this would amount to "put[ting] an octagonal peg in a heptagonal hole."

In addition, Tennessee Code Annotated § 42-4-105(d)(1)(A) (West October 1, 2007, to June 30, 2023) previously provided that after their initial terms, board members would serve terms of seven years' duration. However, section 2(1)(D) of the Act sets board members' terms at four years after their initial terms. The State does not sufficiently address this obvious conflict. We therefore conclude that elision of only section 2(1)(C) does not present a viable solution, and we affirm the trial court's decision to elide section two in its entirety.

## V. Section Two and the Anti-Ripper Clause

The trial court also determined that section two of the Act violated the Anti-Ripper Clause found within the Home Rule Amendment. Because we have determined that section two violated the Local Legislation Clause and was thus unconstitutional, we deem this issue to be pretermitted as moot.

## VI. Equal Protection

The trial court additionally found that sections two, six, seven, eight, and nine of the Act violated the equal protection guarantee found in the Tennessee Constitution. As our Supreme Court has explained concerning this guarantee:

> We have recognized that both the United States and Tennessee Constitutions guarantee citizens the equal protection of the laws. We have also recognized that article I, section 8 and article XI, section 8 of the Tennessee Constitution confer "essentially the same protection" as the Fourteenth Amendment to the United States Constitution, despite the historical and linguistic differences between the equal protection provisions. *State v. Tester*, 879 S.W.2d 823, 827 (Tenn. 1994) (quoting *Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 152 (Tenn. 1993)).

Consequently, this Court has adopted an analytical framework similar to that used by the United States Supreme Court in analyzing equal protection challenges. Under this framework, one of three standards of scrutiny applies, depending upon the nature of the right asserted or the class of persons affected: (1) strict scrutiny; (2) heightened scrutiny; or (3) reduced scrutiny, applying the rational basis test.

*Gallaher*, 104 S.W.3d at 460 (other internal citations omitted). The trial court found and the parties agree that rational basis review is appropriate in this matter.

In *Gallaher*, the Supreme Court further clarified regarding rational basis review:

The equal protection provisions of the federal and state constitutions demand that persons similarly situated be treated alike. *See Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 153 (Tenn. 1993). When applying the rational basis test, we have observed that state legislatures have the initial discretion to determine what is "different" and what is "the same" and that they are given considerable latitude in making those determinations. *See* [*State v.*] *Robinson*, 29 S.W.3d [476,] 480 [(Tenn. 2000)] (citing *Tenn. Small Sch. Sys.*, 851 S.W.2d at 153). Our inquiry into legislative choice usually is limited to whether the challenged classifications have a reasonable relationship to a legitimate state interest. *See id*. We have held that under the rational basis test, a statute may discriminate in favor of a certain class, as long as the discrimination is founded upon a reasonable distinction or difference in state policy. *See Castlewood, Inc. v. Anderson County*, 969 S.W.2d 908, 910 (Tenn. 1998).

*Gallaher*, 104 S.W.3d at 461.

The State argues that Metro Nashville lacks standing to assert an equal protection claim with reference to sections six through nine of the Act because these sections have not caused Metro Nashville to suffer a "distinct and palpable injury." *See City of Memphis v. Hargett*, 414 S.W.3d 88, 98 (Tenn. 2013) (internal citation omitted). While conceding that sections six through nine confer power upon MNAA to, *inter alia*, acquire land by eminent domain and exercise zoning authority, the State urges that such "conferral does not injure Metro Nashville, which retains its sovereign authority to exercise eminent domain and zoning control." We disagree. An obvious conflict exists between Metro Nashville's "sovereign authority to exercise eminent domain and zoning control," as the State points out, and the powers granted to MNAA by sections six through nine of the Act, which include the power to acquire property by eminent domain; the power to construct, alter, or relocate public streets; and the power to affect zoning changes based on the needs of the airport. We fail to see how the same range of powers can be granted to both entities without infringement on one by the other. We agree with

the trial court, which noted that certain of the Act's provisions "place[] a burden on the qualifying county by elevating an agency to a competing entity in the exercise of those powers." We therefore determine the State's argument regarding Metro Nashville's purported lack of injury to be unavailing, and we affirm the trial court's determination that Metro Nashville maintained standing to assert its equal protection claim.

Turning to the merits of the equal protection claim, Metro Nashville posited that the Act violated the Tennessee Constitution's equal protection guarantee because the Act irrationally treated MNAA differently than the other airport authorities. The trial court agreed, determining that section two and sections six through nine violated the equal protection guarantee of the Tennessee Constitution.

As noted above, the parties agree that the applicable level of scrutiny in assessing the constitutionality of the Act is rational basis. The State argues that the trial court erred and that the Act does meet the rational basis standard. In support of this contention, the State relies upon two core arguments. First, the State argues that treating MNAA differently than the other airport authorities is constitutionally permissible because Nashville International Airport is different in a variety of important ways, such as the number of passengers and the economic impact on the state, than the Chattanooga, Knoxville, and Memphis airports. Second, the State contends that there is a rational basis for drawing a distinction among the airport authorities based upon the population level and governance under a metropolitan form of government. Metro Nashville defends on both fronts, arguing that MNAA is akin to, rather than different than the other airport authorities, most especially the Memphis International Airport, and that population and form of government bases of classification under the statute do not rationally support treating MNAA differently.

"[C]lassification is a necessary ingredient of laws. Virtually all laws create distinctions between persons or groups." Jeffrey M. Shaman, *The Equal Protection Clause*, 3 ENCYCLOPEDIA OF THE AMERICAN JUDICIAL SYSTEM: STUDIES OF THE PRINCIPAL INSTITUTIONS AND PROCESSES OF LAW 1038 (ed. Robert Joseph Janosik 1987). In assessing an equal protection challenge to statutory distinctions utilizing a rational basis mode of analysis, the Tennessee Supreme Court has indicated "that state legislatures have the initial discretion to determine what is 'different' and what is 'the same' and that they are given considerable latitude in making those determinations." *Gallaher*, 104 S.W.3d at 461. Unless the challenger "can establish that the differences are unreasonable, the statute must be upheld." *Lynch v. City of Jellico*, 205 S.W.3d 384, 396 (Tenn. 2006) (quoting *Brown v. Campbell Cnty. Bd. of Educ.*, 915 S.W.2d 407, 414 (Tenn. 1995)). In an equal protection challenge, the rational basis test "examines 'whether the classifications have a reasonable relationship to a legitimate state interest.'" *Hughes v. Tenn. Bd. of Prob. & Parole*, 514 S.W.3d 707, 716 (Tenn. 2017) (quoting *Tenn. Small Sch. Sys. v. McWherter*, 851 S.W.2d 139, 153 (Tenn. 1993)). The statutory discrimination will be permissible "as long as the discrimination is founded upon a

reasonable distinction or difference in state policy." *Hughes*, 514 S.W.3d at 720 (quoting *Gallaher*, 104 S.W.3d at 461). Reasonable distinctions "must be based upon substantial distinctions which make one class really different from another; and the characteristics which form the basis of the classification must be germane to the purpose of the law. . . ." *State v. Tester*, 879 S.W.2d 823, 829 (Tenn. 1994) (quoting *State v. Nashville, C. & St. L. Ry. Co.*, 135 S.W. 773, 776 (Tenn. 1911)). In engaging in this assessment, the Tennessee Supreme Court has indicated that "[i]t is not necessary that the legislature state a rational basis for this differential treatment. A classification will pass constitutional muster if we can conceive of some rational basis for the distinction." *Gallaher*, 104 S.W.3d at 461.

When conducting such a review, the Tennessee Supreme Court has applied both modes of analysis that are suggested by the State's arguments when considering the constitutionality of legislative distinctions drawn. The Tennessee Supreme Court has analyzed the constitutionality of the state legislation in light of distinctions drawn based upon the statutory basis of classification, for example, distinctions predicated upon population or form of government.[3] The Tennessee Supreme Court has also analyzed whether differential statutory treatment of a particular jurisdiction is rational in light of actual variances between jurisdictions.[4]

---

[3] *See, e.g.*, *Knoxville's Cmty. Dev. Corp. v. Knox Cnty.*, 665 S.W.2d 704, 705 (Tenn. 1984) (addressing legislation related to the financing of redevelopment plans for municipal housing authorities that applied only to Knox and Hamilton counties, noting the absence of evidence to support distinctions justifying the classification, and concluding the measure was unconstitutional in light of failure to show that there was a greater need for such legislation within the specified population band counties than in smaller counties); *State ex rel. Bales v. Hamilton Cnty.*, 95 S.W.2d 618, 618-19 (Tenn. 1936) (addressing a law that applied only to Hamilton County that limited the County's discretion regarding teachers contracts in a manner different than other Tennessee counties, noting that "[n]o reason is suggested to justify the denial of such rights to Hamilton County," and concluding the statute could not be upheld based simply upon the statute only referencing Hamilton County by population band "[u[nless the act relates to a matter in respect of which a difference in population would furnish a rational basis for diversity of laws").

[4] *See, e.g.*, *Tester*, 879 S.W.2d at 829-30 (addressing legislation that allowed a certain category of DUI offender to serve mandatory jail time in a work-release program in Davidson, Moore, and Shelby, but not other, counties; considering the State's argument that the measure did not violate equal protection because the jails in those three counties are overcrowded in connection with incarceration of the DUI offenders; and rejecting this argument because the state failed to provide evidence to support its contention that the overcrowding problem was worse in these three counties or connected with this type of offense and because evidence showed overcrowding in other counties); *Sandford v. Pearson*, 231 S.W.2d 336, 339 (Tenn. 1950) (addressing beer regulation legislation applied exclusively to Haywood County, which was identified by population band in the legislation; indicating that the core question in assessing equal protection is whether "the classification of Haywood County with regard to the sale of beer as being unique and distinguishable from the same legislative problem as it presents itself in the other 94 counties of the State, is a reasonable or an arbitrary classification"; and concluding, in the absence of evidence to the contrary, that "we can imagine no basis on which to distinguish any aspect of the beer problem in Haywood County, from the same problem in the other counties of the same or similar size throughout the State"); *Elliott v. Fuqua*, 204 S.W.2d 1016, 1017 (Tenn. 1947) (addressing legislation regulating

In the present case, this Court, as argued by Metro Nashville and found by the trial court, has concluded that the statutory measures apply solely to Metro Nashville and not to any other county or city in the State of Tennessee. Given that conclusion, when assessing the constitutionality of such legislation under a rational basis standard, actual distinctions between Nashville International Airport and other airports can potentially provide a rational basis for the statutory differential treatment between it and other airport authorities. In other words, given that the legislation treats Nashville International Airport differently, when determining whether there is a rational basis for the differential treatment, it is appropriate to consider if there are actual variances among the airports that rationally provide a basis for that differential treatment.

In defending the constitutionality of the Act, the State asserts that the Act (1) promotes growth among metropolitan airport authorities; (2) renders metropolitan airport authority boards more accountable to the regions they serve; (3) provides the State with control over appointment of the metropolitan airport authority board members, especially important when the airport is of "statewide concern"; and (4) provides geographic diversity for such boards.

Additionally, the State observes the following regarding distinctions between Nashville International Airport and the airports operating under airport authorities in Chattanooga, Knoxville, and Memphis:

> Nashville International Airport has over four times more commercial traffic than any other metropolitan airport, and that traffic has grown at a faster rate than any other metropolitan airport. That new traffic creates unique problems among metropolitan airports, including an unprecedented need for more gates, more concourses, more parking, and more amenities. Along with the singular regulatory problems that growth in traffic creates for Nashville International Airport, it also generates unparalleled economic growth. In 2019, Nashville International Airport generated nearly $10 billion in economic growth and supported over 76,000 jobs. That was more than the economic effects contributed by the three other metropolitan airport authorities *combined*. *See* Tenn. Dep't of Transp., Aviation Impact Study 18-19 (2021), https://bit.ly/3xxDd83.

(Internal citations to record omitted.) Based on these factors, the State argues that the unique characteristics of Nashville International Airport place it in a "class of its own."

---

fireworks only in Davidson County and upholding the measure, noting the reasonableness of the measure in light of the particulars of Davidson County, notably that "[t]he metropolitan area comprising the City of Nashville extends far beyond the city limits and that part of Davidson County outside the City of Nashville is generally well populated").

The litigants filed numerous declarations and other documents concerning this issue. Such evidence included a declaration of D. Kirk Shaffer, an attorney who had formerly served with both MNAA and the Federal Aviation Administration. Mr. Shaffer stated:

> [I]n 2019 Nashville International [Airport] generated more than $9.9 billion in total economic impact, supported more than 76,000 jobs in the region, and produced more than $443 million in local, state, and federal taxes. In 2022, 18.4 million passengers transmitted the airport, and 21 million are expected to do so this year. The independent J.D. Power research firm ranked [Nashville International Airport] the 12th best large airport in the nation in 2022.

Other proof in the record further established:

> Nashville International Airport ("BNA") is the busiest passenger airport in Tennessee, with 9,829,062 boarded passengers in calendar year 2022; Memphis Airport was a distant second with 2,163,692 boarded passengers in calendar year 2022. In calendar year 2021, BNA had 7,594,049 boarded passengers, and Memphis Airport had 1,793,073 boarded passengers.

The record also demonstrated that the Knoxville and Chattanooga airports, although clearly significant airports, maintained only a fraction of the commuter traffic and cargo handling managed by Nashville International Airport and Memphis International Airport. As to cargo handling, in 2021, Memphis International Airport handled 24.9 billion pounds of landed cargo—more than ten times the amount Nashville International Airport handled.

The trial court concluded that the State's distinguishing between the airports was unpersuasive in light of the exclusion from the challenged statutory amendments of the Memphis International Airport, which the trial court regarded as closely akin to Nashville International Airport and described as the "world's busiest cargo airport." Similarly, Metro Nashville emphasizes the difference in treatment of these two airports despite the clear importance of Memphis International Airport and its traffic.

From our review of the record, we disagree with the trial court's determination that the State failed to establish a rational basis for the differential treatment of MNAA in section two and sections six through nine of the Act. All four airport authorities are plainly of significance to the State of Tennessee, and Memphis International Airport is a more significant airport for cargo than Nashville International Airport. Nevertheless, given the deferential rational basis standard, we cannot conclude that drawing a distinction between Nashville International Airport and Memphis International Airport, or Chattanooga or Knoxville, is unreasonable. Nashville International Airport has more

than five times as many boarded passengers as the next closest Tennessee airport, Memphis International Airport. The economic effects of Nashville International Airport on the state are greater than the Chattanooga, Knoxville, and Memphis airports combined. Considering the factual evidence presented, *see Tester*, 879 S.W.2d at 826, we cannot say that, in exercising greater state and regional influence over MNAA or expanding its powers, drawing a distinction between Nashville International Airport and the other airports is irrational.

In reaching this conclusion, we emphasize, as noted above, that the legislature is not required to state a rational basis for the classification in the statute; rather, the "classification will pass constitutional muster if we can conceive of some rational basis for the distinction." *See Gallaher*, 104 S.W.3d at 462. Moreover, the "burden of showing that a classification is unreasonable and arbitrary is placed upon the individual challenging the statute." *See Harrison v. Schrader*, 569 S.W.2d 822, 826 (Tenn. 1978). We conclude that Metro Nashville has failed to do so in this instance. Pursuant to our Supreme Court's direction, "if any state of facts can reasonably be conceived to justify the classification or if the reasonableness of the class is fairly debatable, the statute must be upheld." *See id*. Based upon that mandate, we conclude that the trial court erred in determining that sections two, six, seven, eight, and nine of the Act violate the equal protection guarantee found in the Tennessee Constitution. Accordingly, we reverse the trial court's determination that these sections are unconstitutional and its elision of sections six, seven, eight, and nine from the statute.

## VII. Conclusion

For the foregoing reasons, we affirm the trial court's determination that section two of the Act is unconstitutional. However, we reverse the trial court's determination that sections two, six, seven, eight, and nine of the Act violate the equal protection guarantee found in the Tennessee Constitution. We therefore also reverse the trial court's elision of sections six, seven, eight, and nine from the statute. Costs on appeal are assessed one-half to the appellants, Governor Bill Lee, Speaker of the Senate Randy McNally, and Speaker of the House Cameron Sexton, and one-half to the appellee, Metropolitan Government of Nashville and Davidson County. This case is remanded to the trial court for further proceedings consistent with this Opinion and collection of costs assessed below.

s/Thomas R. Frierson, II

_____
THOMAS R. FRIERSON, II, JUDGE